1          UNITED STATES DISTRICT COURT

2          DISTRICT OF SOUTH DAKOTA

3          WESTERN DIVISION
   * * * * * * * * * * * * * * * *   * * * * * * * * * *
4  UNITED STATES OF AMERICA,        * CR No. 18-50117
                      Plaintiff,    *
5                                   * SENTENCING
      vs.                           *
6                                   * December 16, 2019
   HENRY CHASE ALONE,               *
7                      Defendant.   *
   * * * * * * * * * * * * * * * *   * * * * * * * * * *

8

9          PUBLIC TRANSCRIPT OF SENTENCING

10     BEFORE THE HONORABLE JEFFREY L. VIKEN,

11        U.S. CHIEF DISTRICT COURT JUDGE

12     **(PURSUANT TO STANDING ORDER 16-04, PORTIONS OF ALL**

13  **CHANGE OF PLEA AND SENTENCING TRANSCRIPTS ARE RESTRICTED)**

14  APPEARANCES:

15  FOR THE PLAINTIFF:   MEGAN POPPEN
                        US ATTORNEY'S OFFICE
16                      515 Ninth Street, Room 201
                        Rapid City, SD 57701
17                      (605) 342-7822
                        megan.poppen@usdoj.gov
18
    FOR THE DEFENDANT:   STEPHEN D. DEMIK
19                      LAW OFFICE OF STEPHEN D. DEMIK
                        1617 Sheridan Lake Road
20                      Rapid City, SD 57702
                        (605) 646-3391
21                      stephen.demik@demiklaw.com

22  COURT REPORTER:     SHERI L. NOT HELP HIM, RPR, CRR
                        Official Court Reporter
23                      550 Ninth Street, #302
                        Rapid City, SD  57701
24                      Phone: (605) 399-6007
                        Sheri_Nothelphim@sdd.uscourts.gov
25

```
 1                    I N D E X

 2                                             PAGE
        December 16, 2019, Sentencing Hearing     3
 3
        SPECIAL AGENT JESSE FAGERLAND             11
 4      Direct Examination by MS. POPPEN          11
        Cross-Examination by MR. DEMIK            20
 5      Redirect Examination by MS. POPPEN        22

 6      HENRY CHASE ALONE                         32
        Direct Examination by MR. DEMIK           32
 7
        Statement of Federal Sentencing Guideline 39
 8      Calculation by THE COURT

 9      Comments by Rochelle Chase Alone          48

10      Comments by Adeline Chase Alone           54

11      Comments by the Defendant                 56

12      Comment by MS. POPPEN                     61

13      Comments by G.R.N.                        68

14      Comments by Ms. Deb Franchetti            74

15      Statement of Reasons by THE COURT         79

16      Imposition of Sentence by THE COURT       91

17

18

19

20

21

22

23

24

25
```

```
 1              PROCEEDINGS ~ DECEMBER 16, 2019
 2              Before Hon. JEFFREY L. VIKEN, Judge
 3

 4         (Proceedings in open court at 10:35 a.m.)
 5         THE COURT:  This is the time set for a
 6  sentencing in the case of United States versus Henry Chase
 7  Alone, our file 18-50117.
 8              May I have the appearance of government counsel,
 9  please?
10              MS. POPPEN:  Good morning.  Megan Poppen on
11  behalf of the United States.  Next to me is FBI Special
12  Agent Kevin Seymore.  And next to Agent Seymore is DCI
13  Special Agent Jesse Fagerland.
14              THE COURT:  Yes.  Good morning.
15         Defense?
16              MR. DEMIK:  Good morning, Your Honor.  Stephen
17  Demik on behalf of Mr. Chase Alone, who is present in the
18  courtroom.
19              THE COURT:  Good morning, Mr. Demik.
20              MR. DEMIK:  Good morning, Your Honor.
21              THE COURT:  Good morning, Mr. Chase Alone.
22              THE DEFENDANT:  Good morning.
23              THE COURT:  We have Ms. Erin Becker with us from
24  United States Probation.  Of course, Ms. Becker prepared
25  your presentence investigation report.
```

1          Have you had enough time to work with Mr. Demik

2   to prepare for sentencing today?

3          THE DEFENDANT:  Yes, I have.

4          THE COURT:  As we go along here, if you have

5   questions and wish to speak with your attorney, would you

6   let me know that, please?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  Because we'll take a break and you

9   can work with Mr. Demik as much as you wish today.

10         Let me list for counsel what materials I've

11  studied in preparation for sentencing today.  And Counsel,

12  if there is anything in addition, please let me know that.

13         We're before the Court, of course, Mr. Chase

14  Alone, on a verdict which was rendered in this court at

15  the conclusion of a trial.  The verdict was January 10th

16  of 2019.  And the jury found you guilty of count one,

17  count two, and count three.  The first and second counts

18  are inducing, persuading, using, enticing, coercing, in

19  count one G.R.N. to engage in sexually explicit conduct

20  for a purpose of reducing a visual depiction of the

21  conduct.  And you were convicted of that, the use of a

22  security camera to film a sex act.

23         Count two involved a minor named N.H.; and

24  again, it's the same offense type:  Coercing or enticing a

25  minor to engage in sexually explicit conduct for the

1    purpose of producing a visual depiction of the conduct.

2         In count three, the jury found you guilty of

3    engaging in intercourse, which constituted incest, around

4    August 20, 2018, at Manderson, South Dakota.

5         So a conviction on all three counts, which

6    brings us to this day.  I did carefully study the

7    presentence investigation report.

8         There are no United States objections to the

9    report, Ms. Poppen?

10        MS. POPPEN:  Correct.

11        THE COURT:  And there are quite a number of

12   defense objections, docket entry 140, Mr. Demik.  You

13   filed your objections.  And we'll talk more, of course,

14   about the objections and about the federal sentencing

15   guidelines, so we will come back to that.

16        If I understood your sentencing memorandum

17   correctly, Mr. Demik, you're asking for a 15-year sentence

18   followed by five years of supervised release, based on a

19   downward variance under 18 United States Code Section

20   3553(a).  Is that correct?

21        MR. DEMIK:  That's correct, Your Honor.  We are

22   asking for the mandatory minimum.

23        THE COURT:  All right.  And attached to your

24   sentencing memorandum as Exhibit A was your letter,

25   Mr. Chase Alone, telling me about your personal history,

1    your childhood, your dysfunctional upbringing, your

2    alcoholism, your relationships, the tragic loss of your

3    daughter, your plans for the future, and your work in

4    ministry and your plans for community service.  A very

5    articulate letter.  I respect receiving that from you.

6              Exhibit B to the defendant's sentencing

7    memorandum constituted support letters, of course.  Your

8    wife, Rochelle, has written a number of letters to the

9    Court.  There's a recent letter and then a January 2019

10   letter.

11             Also in Exhibit B was a letter from Pastor

12   Jedidiah Jezek and his wife Sally.  They have known

13   Rochelle, your wife, Cheyenne River, since she was a young

14   person.  And he just met you through the church.  And I

15   believe that Pastor Jezek performed the marriage ceremony

16   in 2019 between you and Rochelle.  He said in his letter

17   he's visited you monthly for many months.  And he's

18   supporting your Christian endeavors and your interest in

19   Christian ministry and your future plans.  He makes it

20   clear he really doesn't know anything about why you're

21   here, what the crimes of which you've been convicted are

22   all about.

23             There was a letter earlier on from Sonya Chase

24   Alone, an aunt of yours, and I reviewed that as well.

25             There was a victim impact statement from the

1      Department of Social Services.

2              The victim impact statement from the Department

3      of Social Services, Child Protection Services, by Deb

4      Franchetti, who's a Family Services Specialist, lays out

5      in great detail.  I will not repeat all of that here.  She

6      concludes from her work with the family that you're a

7      master at manipulation, and that G.R.N. was deeply

8      affected, feels broken, she's still in a victim cycle, and

9      a lot of complicated feelings.  And the letter also talks

10     about the impact of incest, which, of course, produced a

11     son.

12             There was a four-page letter entitled "G.R.N.'s

13     Victim Impact Letter," which describes trauma and abuse

14     and ongoing struggles in treatment.  It's a very powerful

15     letter, very difficult letter to read.

16             I did carefully study Dr. Ertz's psychosexual

17     evaluation which was performed at the direction of the

18     Court.  Dr. Ertz is a credible psychologist, frequently

19     appearing in this court, either at the direction of the

20     Court on a psychosexual assessment before sentencing or

21     called by the defense frequently on psychosexual or other

22     psychological matters.  He's an incredible psychologist.

23             And his lengthy report under risk assessment

24     says that for future sexual contact with underage females,

25     you're a moderate to high risk.  Under psych testing, he

1    concludes you're a borderline with regard to cognitive

2    skills.

3          Under nonsexual recidivism, you are at the

4    maximum risk in the scoring system the psychologists use.

5    He did diagnose you with post-traumatic stress disorder,

6    depressive disorder, antisocial personality disorder,

7    borderline intellectual functioning, and use disorders for

8    both marijuana and alcohol.  And he recommends, among

9    other things, that you need adult-specific treatment on

10   the mental health component, along with substance abuse

11   treatment.

12         The special conditions of supervised release

13   designed by U.S. Probation as part of your sentence, sir,

14   are based in part on Dr. Ertz's professional

15   recommendations.  And he, of course, has a recommendation

16   that you have no contact with any female under the age of

17   18.

18         And I did recall and review numerous letters

19   that you've written to me through the course of your case.

20   You've had four attorneys in the case.  You've written

21   many letters to me during the course of the case.  I'm

22   familiar with those.

23         And I entered an order most recently that

24   there -- in a pro se filing when you're represented by

25   counsel -- that's something I'll take up -- but of course

1    you have one of the most skilled federal criminal defense

2    attorneys in the District of South Dakota in Mr. Demik

3    who's representing you here.

4         Were there any materials in addition to the ones

5    I've listed for the record review, Ms. Poppen?

6         MS. POPPEN:  No, Your Honor.

7         THE COURT:  Mr. Demik?

8         MR. DEMIK:  No, Your Honor.

9         THE COURT:  All right.  Well, Mr. Chase Alone,

10   the federal sentencing guidelines are one component of

11   federal sentencing in every federal criminal case that

12   gets to sentencing.  The guidelines were put in place in

13   1987 by congress.  The idea was to create some uniformity

14   in federal sentencing so that somebody sentenced in

15   Arizona or New Mexico or New York or Los Angeles or Rapid

16   City would have the same type of custody sentence called

17   for by the guideline calculation.

18        So the guidelines are a whole series of factors

19   that are scored, the outcome of which is to produce a

20   range of months of imprisonment.  And here, for each count

21   except for count three, aggravated incest doesn't have a

22   guideline range.  So we deal with the federal sentencing

23   statute, 3553(a).

24        Every federal judge must do several things with

25   these guidelines at every sentencing.  First, they have to

1    be accurately calculated, which requires me in this case

2    to rule on Mr. Demik's objections that were made on your

3    behalf.  And when the factual objections are made, the

4    objection shifts the burden of proof to the United States

5    to show in this sentencing hearing by the greater weight

6    of evidence that the fact that's challenged is accurate;

7    or I can make a determination based on the evidence and

8    argument that the objection should be sustained and the

9    guideline range would change based on the factors that I

10   remove from the calculation.

11            So I must rule on these objections.

12            The federal sentencing guidelines are no longer

13   binding.  They must be considered by every judge at

14   sentencing.  But they are advisory only.  I'm not bound to

15   follow them.  So there is discretionary sentencing here,

16   and we'll speak about that as the basis of Mr. Demik's

17   motion for a downward variance.

18            I have to balance the factors in 18 United

19   States Code Section 3553(a) and fashion for you a

20   sufficient sentence but a sentence not greater than

21   necessary to accomplish the purposes that congress set out

22   in that statute.

23            And so it is a process that will take us some

24   time.  It's a very important sentencing for you and for

25   the victims of your offenses, as well as for the community

1    and the interests of justice.

2            So let's turn first, Mr. Demik, to your filed

3    objections.

4            The first objection is to paragraphs 12, 16, 17,

5    and 32.  And this has to do with the two-level adjustment

6    for obstruction of justice.  You can see the probation

7    officer's response as to the information that was in the

8    file that was reviewed by the United States.

9            I also, having presided over the trial, have

10   gone back and reviewed certain of the exhibits that were

11   admitted at trial, and they are in evidence, and they can

12   be considered here.  And so there was an audio recording

13   of a jail call between yourself and Rochelle.

14           And I take judicial notice of the exhibits that

15   were admitted into evidence.

16           But the burden does shift to the United States

17   to factually support the obstruction of justice two-level

18   increase, Ms. Poppen.

19           MS. POPPEN:  Yes.  At this time the United

20   States calls Agent Jesse Fagerland.

21                **SPECIAL AGENT JESSE FAGERLAND**

22           called as a witness on behalf of the Prosecution

23   herein, was sworn, examined, and testified as follows:

24                     **DIRECT EXAMINATION**

25           BY THE PROSECUTION:

1    Q.   BY MS. POPPEN:  Good morning, sir.

2    A.   Good morning.

3    Q.   Will you state your name for the record?

4    A.   Jesse Fagerland, F-A-G-E-R-L-A-N-D.

5    Q.   How are you employed?

6    A.   I work for the Pennington County Sheriff's Office.

7    Q.   And back in August of 2018 were you employed in a

8    similar capacity?

9    A.   Yes.  Back in August of 2018 I was in investigations

10   with the Pennington County Sheriff's Office.

11   Q.   And during that time did a case come to your

12   attention regarding the defendant, Henry Chase Alone?

13   A.   Yes, ma'am.

14   Q.   Just briefly, what was the information that you were

15   given that led you to speak with Mr. Chase Alone?

16   A.   Patrol had taken a report that there was a

17   disclosure -- I guess I can't remember exactly what the

18   disclosure entailed.  But I do remember that patrol had

19   taken a report that G.R.N. disclosed that she had had some

20   inappropriate contact with Henry Chase Alone.

21   Q.   And let me just see if this refreshes your memory a

22   little bit.  Did G.R.N. give birth to a baby boy in July

23   of 2018?

24   A.   Yes, absolutely.  And it did come through --

25   Department of Social Services had made that initial report

1    to law enforcement.

2    Q.   And the information that you were given was that DSS

3    suspected that the father of the child was Henry Chase

4    Alone?

5    A.   That's correct.  Yes.  Ma'am.

6    Q.   Okay.  So you spoke with Henry Chase Alone?

7    A.   I did.

8    Q.   And where was that at?

9    A.   At the -- I can't remember the name of the detention

10   facility in Pine Ridge, but it was the detention facility.

11   Q.   And Agent Seymore was with you?

12   A.   Yes, ma'am.

13   Q.   Okay.  Now I just want to jump to G.R.N.'s forensic

14   interview.  Do you recall that?

15   A.   Yes, ma'am.

16   Q.   Part of it, anyway?

17   A.   Parts of it.

18   Q.   Did G.R.N., during that August 2018 forensic

19   interview, did she mention whether or not Henry had

20   recorded her having sexual intercourse with him at their

21   apartment in Rapid City sometime between 2017 and 2018?

22   A.   To be honest, I don't recall if she had mentioned

23   that in a forensic interview.  I do remember that she had

24   mentioned that in an interview with law enforcement.

25   Q.   Okay.  And that was the interview with Agent Tyler

1  Newhart?

2  A.   Yes.  Correct.

3  Q.   And he's a DCI agent?

4  A.   He is, yep.

5  Q.   And he went and interviewed G.R.N. at Parkston Our

6  Home?

7  A.   Yes.

8  Q.   Now why did Agent Newhart interview G.R.N. at that

9  time?

10 A.   I think he may have conducted maybe two or three

11 total interviews with G.R.N..  and they were all due to

12 follow-up questions based on how my investigation was

13 going, revealing new and different details, trying to get

14 further information from her regarding whatever those

15 details were.

16 Q.   And during this interview with Agent Newhart, was one

17 of the questions whether or not Henry had recorded G.R.N.

18 and Henry or anyone else engaging in sexual intercourse?

19 A.   I guess I don't recall if I had asked Agent Newhart

20 to ask that question, but I do know it came up.  So I

21 don't know if he asked it or if it came up voluntarily.  I

22 can't recall at this time.

23        But it did come up, and she did -- G.R.N. did

24 tell Agent Newhart that Henry had recorded her on multiple

25 occasions having sex.

1    Q.   Okay.  Now through your employment and your job, is

2    it common or do sometimes individuals record sexual

3    intercourse when they engage in illegal acts of sexual

4    intercourse?

5    A.   Yes.  Absolutely.

6    Q.   Okay.  And so I want to talk to you about after you

7    learn that G.R.N. had been recorded by Henry.  What do you

8    do?

9    A.   I try and locate those recordings, number one, to

10   preserve them for evidence.  But number two, to get them

11   off of the street, as well.

12   Q.   And what was one of the search warrants or one of the

13   investigation techniques that you use to try to receive or

14   get those items off the street?

15   A.   I guess I don't understand the question.

16   Q.   Sure.

17   A.   I guess what I do is if I am able to locate items

18   that may potentially have these recordings on them, is I

19   write a search warrant, number one, to gain -- if it's a

20   physical item, such as a laptop computer, I would write a

21   search warrant to gain that laptop computer.  And then I

22   would write an additional search warrant to review the

23   contents of that laptop.

24        If it was something in the cloud, like a Google

25   account, I would write a search warrant for Google.

1    Q.   And after testifying to that, did you do those

2    different techniques?

3    A.   I did.  Yes.

4    Q.   Okay.  So you did a Google or a Gmail search warrant?

5    A.   Yep.

6    Q.   And then you did one for a computer that you later

7    retrieved?

8    A.   Yes.  Correct.

9    Q.   All right.  I want to talk about that computer.

10   A.   Okay.

11   Q.   What information did you have that led you to believe

12   that there was a computer?

13   A.   G.R.N. had told Agent Newhart that they had -- and

14   when I say "they," I believe -- I don't know if she

15   mentioned Henry and Rochelle by name, but had stated that

16   they had pawned a laptop computer at Pawn With Us, I

17   believe, on East North Street.

18   Q.   And after receiving that information, did you confirm

19   that the computer was still in pawn?

20   A.   Yeah.  There's a program that our property

21   investigators deal with call Leads Online.  And one of the

22   property investigators looked up both Henry and Rochelle's

23   name and located a laptop computer that had been pawned at

24   Pawn With Us under Rochelle Breckbill's name.

25   Q.   And then after retrieving this computer from pawn,

1    did you write a search warrant to get into the contents of

2    the computer?

3    A.    Yeah.  What I did was I wrote a search warrant for

4    Pawn With Us, because they were in possession of the item.

5    So I provided them with a warrant to -- a signed search

6    warrant to obtain the laptop computer.

7              After taking it and placing it into evidence,

8    then I wrote an additional warrant to go through the

9    contents of the computer.

10   Q.    At the time that you were seeking these search

11   warrants, had you listened to any of Henry's jailhouse

12   phone calls?

13   A.    Yes.

14   Q.    And does he talk about the computer in these phone

15   calls?

16   A.    Yes.

17   Q.    And what does he instruct Rochelle to do?

18   A.    On multiple occasions Henry instructs Rochelle to get

19   the laptop out of pawn.

20   Q.    And was she able to get the laptop out of pawn before

21   you got it?

22   A.    No, ma'am.

23   Q.    So you got the laptop before she could get to it?

24   A.    Yes.

25   Q.    To your knowledge did she make attempts to get to

1    that computer?

2    A.   I guess I can't say for sure.  I know that on the

3    phone calls she tells Henry that she makes attempts.

4    Q.   And then she also tells Henry that you came to her

5    apartment and seized the computer?

6    A.   She does.

7    Q.   Now had she actually been able to get the computer

8    out of pawn before you, would we have had the visual

9    depictions of child pornography?

10   A.   We were able to locate -- I believe we located two

11   incidences on the laptop, and we were able to locate one

12   of those two on a separate search warrant, on the Google

13   account.

14   Q.   Okay.

15   A.   So we would probably, maybe, have access to one, not

16   the other.  Yes.

17   Q.   Okay.  But for the most part, the evidence that was

18   submitted at trial was evidence seized from the computer?

19   A.   Yes.

20   Q.   Okay.  And that included the videos as well as still

21   photos?

22   A.   Yes.

23   Q.   Okay.  Now have you listened to some of the jail

24   phone calls in -- I mean recently?  Have you listened to

25   any recently?  And it's okay if you haven't.

1    A.   I want to say that I've listened to maybe two or

2    three different phone calls since last January.

3    Q.   But as far as the jail calls that were admitted at

4    trial, have you listened to those recently?

5    A.   Oh, I'm sorry.  Yes.  I believe I listened to parts

6    of them, but I did review my report which documented what

7    was said in those phone calls.  Yes.

8    Q.   Okay.  And do you have your report there in front of

9    you?

10   A.   I do.  Yes.

11   Q.   Okay.

12             MS. POPPEN:  I am going to just ask the Court

13   what the Court's preference would be.  Agent Fagerland has

14   very detailed notes on the transmissions in the phone

15   calls that talk about getting the computer out of pawn and

16   the purpose.  Otherwise, I can play about three or four

17   different jail calls, limited to maybe one minute to five

18   minutes of audio.

19             THE COURT:  I'm taking judicial notice of trial

20   Exhibits 3, 4, 6, 7, 8, 9, 10, and 11.  I listened to

21   those calls that were played at trial, as did the jury.

22   There transcripts for those calls to assist the jury in

23   following along with the audio.  The transcripts were not

24   put in evidence, of course.  They were simply an aid to

25   listen to the calls.

1    It is the calls themselves which constitute the

2  evidence, and they're contained in the exhibits I

3  identified.  Those calls contain specific information

4  about Mr. Chase Alone asking Rochelle to get a hold of

5  that laptop, get it out of pawn, make sure law enforcement

6  doesn't find it, and various discussions about the details

7  concerning that.

8    So I take judicial notice of that evidence.  I

9  find it to be credible evidence.

10    MS. POPPEN:  Thank you.  Then with that, I do

11  not intend to offer any additional audio.  And that's -- I

12  believe that's all I have for that objection.

13    THE COURT:  All right.  Do you wish to

14  cross-examine on this point, Mr. Demik?

15    MR. DEMIK:  May I have one second, Your Honor,

16  please?

17    THE COURT:  Take all the time you need.

18    (Mr. Demik and the defendant conferred off the

19    record.)

20    MR. DEMIK:  I just have two questions, Your

21  Honor.

22    THE COURT:  Certainly.

23                    **CROSS-EXAMINATION**

24    BY THE DEFENSE:

25  Q.   BY MR. DEMIK:  Who had gone to get G.R.N. on December

1    the 5th, 2018, with DSS case worker Deb Franchetti.  Do

2    you know?

3    A.   I don't recall at this time.  I could review my

4    report, if I had written it in there.

5    Q.   Sure.

6         THE COURT:  Do you have your report?

7         THE WITNESS:  I do.  Sure.

8         THE COURT:  That's workable for you, Mr. Demik?

9         MR. DEMIK:  That's fine.

10        THE WITNESS:  December 5th?

11   Q.   BY MR. DEMIK:  December 5th, 2018.  Yes.

12   A.   It looks like on my notes I've got some events that

13   I've got documented on December 5th, but I don't have

14   anything that relates to your question.  So I guess I

15   can't recall at this time, sir.

16   Q.   Okay.  And my other question is did they -- did you

17   get the video camera footage from the pawn shop, I guess,

18   inside the pawn shop, showing who pawned the three items?

19   A.   I did not.

20        MR. DEMIK:  No further questions.

21        THE WITNESS:  Can I elaborate on that?

22        MR. DEMIK:  Sure.

23        THE WITNESS:  Through that program, Leads

24   Online, the person that pawns the item is listed on that

25   documentation, as well as a copy of their driver's

```
 1    license.  And it was Rochelle Breckbill, both listed and a

 2    copy of her license.

 3              MR. DEMIK:  Thank you.

 4              No further questions, Your Honor.

 5              THE COURT:  Any redirect on that point,

 6    Ms. Poppen?

 7              MS. POPPEN:  Just one thing I wanted to have the

 8    agent clarify.
```

**REDIRECT EXAMINATION**

```
10              BY THE PROSECUTION:

11    Q.   BY MS. POPPEN:

12              Sir, can you tell the Court who Henry Chase

13    Alone received that laptop from?

14    A.   Yeah, it was a neighbor.  And the best of my

15    recollection, his name was Vinnie, and I can't recall his

16    last name.  But I did interview that neighbor as well.

17    Q.   And he told you that he gave the laptop to Henry

18    because Henry helped him move some stuff from the

19    apartment?

20    A.   That is correct.  Yes.

21    Q.   Thank you, sir.

22              MS. POPPEN:  Those are all the questions I have.

23              THE COURT:  Any follow up to that, Mr. Demik?

24              MR. DEMIK:  No, Your Honor.

25              THE COURT:  Ruling on objection number one by
```

1  the defense, the objection as to the application of the

2  two-level adjustment for obstruction of justice is

3  overruled.  I find that Investigator Fagerland's testimony

4  is credible, and I take judicial notice of the identified

5  exhibits -- which were the audio recordings, the phone

6  calls -- which clearly, in my view, would be a proper

7  factual basis to overrule the objection.  There was

8  obstruction of justice, as understood by the federal

9  sentencing guideline definition.  So the objection is

10  overruled.

11       Let's turn to objection -- did you have any

12  record further on that, Mr. Demik?

13       MR. DEMIK:  No, Your Honor.

14       THE COURT:  Let's turn to objection two, which

15  is as to paragraph 24.  And this challenges the probation

16  office's decision not to group counts one and two under

17  the guideline system.  It also raises issues of

18  double-counting.

19       I've reviewed the probation officer's response.

20  Do you wish to provide evidence on objection number two?

21       MR. DEMIK:  No, Your Honor.

22       MS. POPPEN:  I --

23       MR. DEMIK:  Oh, I'm sorry.

24       MS. POPPEN:  I can.  I would just ask the Court

25  to take judicial notice of the testimony and evidence from

1    G.R.N. as well as N.H. Helper, as well as the agent

2    regarding the incest incident from August of 2018.

3           THE COURT:  Well, I do take judicial notice of

4    that testimony and of the other parts of the trial record.

5           Now, the witnesses who testified as to count one

6    and count two, the exploitation of minors to produce

7    video, both G.R.N. and N.H. were credible witnesses at

8    trial.  And I do make that finding.

9           Now, do you wish to argue this objection number

10   two, Mr. Demik?

11          MR. DEMIK:  No, Your Honor.  I think it's made

12   for the record.

13          THE COURT:  Yes.  It's made for the record, but

14   let's be clear.

15          When one applies the federal sentencing

16   guidelines, they have to be applied consistently.  That

17   is, I can't alter the application of the guidelines in any

18   particular case.  The Sentencing Reform Act was dedicated

19   to the purpose of uniformity in federal sentencing, but

20   also of course judges are required to apply the federal

21   sentencing guidelines in a uniform fashion.

22          Here the challenge is addressed by guideline

23   3D1.2, as to the grouping of counts.  Now you've raised a

24   matter of double-counting or similarity between counts one

25   and two, count one involving G.R.N., count two involving

1    N.H..  and the argument from the defense is those are

2    aggravated harms because of the circumstances occurring on

3    the same day and so forth.  But the simple truth is this:

4    When you apply the grouping guideline, and you look at

5    double-counting, if we look at count one, here are the

6    differences that are clear from both the trial testimony

7    and the trial testimony as it supports the decision of

8    probation not to group counts one and two:

9         The victim in count one is G.R.N..  her total

10   offense level was 46.  The victim in count two is N.H..

11   the total offense level was 40.  So the factors that were

12   applied under the guideline system to the separate victims

13   were, indeed, separately considered.  There's no aggregate

14   harm.  There's separate harms both as to G.R.N. and as to

15   Noah.  And under those circumstances, you cannot group.

16        There are some common specific offense

17   characteristics between counts one and count two.  But if

18   you study the guideline calculation, you'll see that for

19   N.H., there is no supervisory control.  There wasn't any

20   care, custody, or control for N.H..  whereas for G.R.N.,

21   Mr. Chase Alone's daughter, paragraph 29 of the guideline

22   calculation does apply the enhancement or adjustment for

23   G.R.N. being under the -- you know, supervision, control,

24   custody of her father, the defendant, Mr. Chase Alone.

25        So that clearly is a difference in the

1    application of the guidelines.

2              Under paragraph 30, under count one for G.R.N.,

3    she was determined to be a vulnerable victim with regard

4    to Mr. Chase Alone.  Whereas -- because she was a

5    daughter, she was living with Mr. Chase Alone.  Whereas

6    for N.H., he's not given any vulnerable victim

7    consideration, and the guidelines were not increased for

8    him in the calculation for count two.

9              So in paragraph 36 for G.R.N., there's

10   aggravated sexual abuse involved with regard to G.R.N. as

11   a victim.

12             Let me check the paragraph number.

13             Yes.  If you look at paragraph 27 for G.R.N.,

14   four levels are added as specific offense characteristics

15   because there was aggravated sexual abuse with regard to

16   her.  Four levels are added.

17             With regard to count two, involving N.H., two

18   levels are added because the commission of the sexual act

19   was part of it, but it was not aggravated sexual abuse as

20   determined by the guidelines for count one involving

21   G.R.N..  and so again, there's a difference; the outcome

22   being completely different offense characteristics and

23   adjustments between the victim in count one, the victim in

24   count two.  They are separate harms, and they are not

25   grouped under the guidelines.  That's a correct

 1    determination.

 2           There is no double-counting.  It's clear that

 3    Ms. Becker applied the federal sentencing guidelines

 4    independently to G.R.N. for count one and independently to

 5    Noah for count two, producing total offense levels of 46

 6    for count one, G.R.N., and 40 for N.H., count two.

 7           So I'm going to overrule objection number two on

 8    that basis.  And I do find that the factual basis for

 9    those guideline adjustments and specific offense

10    characteristics are in credible trial testimony.

11    Objection number two is overruled.

12           Do you have further record on objection two,

13    Mr. Demik?

14           MR. DEMIK:  No, Your Honor.

15           THE COURT:  Objection three is as to paragraphs

16    28 and 37, arguing that both for count one and count two

17    Mr. Chase Alone's conduct does not tout distribution of

18    the video images.  There's a two-level enhancement applied

19    for count one and count two with regard to that.

20           The probation officer's response, of course, is

21    under guideline 2G2.1(b)(3), it's the knowing engagement

22    in distribution of the prohibited materials.

23           Do you wish to present evidence as to paragraphs

24    28 and 37 on distribution, Ms. Poppen?

25           MS. POPPEN:  Your Honor, I would ask the Court

1    to take judicial notice of the trial testimony from

2    G.R.N., who testified about the videos being exchanged via

3    Facebook Messenger.  Additionally, Agent Fagerland's

4    testimony moments ago about how child pornography was

5    located on the Google account.  By its nature, it had to

6    have been up loaded to the Google account, or downloaded,

7    actually, to the Google account.  Therefore, it would

8    constitute distribution in a legal definition.

9            THE COURT:  Yes.  Well, do you have a response

10   to that, Mr. Demik?

11           MR. DEMIK:  No, Your Honor.

12           THE COURT:  Yes.  The indictment correctly

13   charges the distribution of the videos took place using an

14   internet-capable device, which is interstate commerce,

15   which is the federal jurisdictional requirement.

16           But, they were posted to G.R.N.'s Facebook

17   account, and that did constitute distribution.  And so the

18   objection to paragraphs 28 and 37, objection number 3,

19   that objection is overruled.

20           I do rely on the credible testimony of G.R.N.

21   and now Investigator Fagerland and his testimony today,

22   which I find credible on objection three.

23           Objection three is overruled.

24           Objection number four is to paragraphs 54

25   through 63.  It has to do with an uncharged allegation

1    from 2000.  And you don't dispute the conviction, but what

2    is your concern with paragraphs 54 through 63, Mr. Demik?

3              MR. DEMIK:  Mr. Chase Alone denies the conduct,

4    Your Honor.

5              THE COURT:  Yes.  Ms. Poppen?

6              MS. POPPEN:  Your Honor, I'd ask the Court to

7    take judicial notice of the information contained in those

8    paragraphs, as I believe those are similar or perhaps

9    taken from the PSR from the charged allegation in 2000.

10             He was underage at the time, although he did

11   admit and plead guilty to an assault resulting in serious

12   bodily injury, and he was convicted before this Court.

13             THE COURT:  Yes.  I have the judgment from the

14   events that took place connected with the assault.  I have

15   the presentence investigation report from July 28th of

16   2015.  The plea of guilty was to assault resulting in

17   serious bodily injury, but the allegations in the

18   indictment also charged the sexual misconduct, which is

19   the subject of the objection.

20             I know Mr. Chase Alone continues to deny that.

21   But there was a conviction.  The plea bargaining took

22   place.  The sexual aspect of it was reduced to a plea of

23   assault resulting in serious bodily injury.  The judgment

24   in that case was entered March 9th of 2016.  And

25   140 days -- it was a time-served sentence under the

1    circumstances.  But the allegation was accurate, and it

2    was considered in the course of sentencing in that case.

3          So I understand Mr. Chase Alone denies the

4    conduct and pled guilty to assault resulting in serious

5    bodily injury.  But paragraphs 54 to 63, that information

6    is a matter of which I can take judicial notice, and I do

7    so.

8          Anything further on objection four, Mr. Demik?

9          MR. DEMIK:  No, Your Honor.

10         THE COURT:  Objection four is overruled.

11         Objection number five is as to paragraphs 64,

12   65, 129, and 130.

13         64 and 65 have to do with the hammer attack on

14   G.R.N. and the assaults on her.  That's described in 64

15   and 65.

16         Paragraphs 129 and 130, those are required

17   paragraphs that United States Probation officers are

18   required to put in every presentence report in the

19   country.  If there are identifiable grounds for upward or

20   downward departures, those have to be identified for

21   counsel and for the court.  They have no effect on -- the

22   guideline calculation, and they have no effect on

23   sentencing unless I give notice of an upward departure.

24   But those are simply required paragraphs in every

25   presentence.

```
1              But as to 64 and 65, Ms. Poppen, do you wish to
2    discuss those matters?
3              MS. POPPEN:  Yes.
4              I would just ask the Court to take judicial
5    notice of this, as this was testified to by the victim,
6    G.R.N..
7              THE COURT:  Mr. Demik?
8              MR. DEMIK:  May I have one second, Your Honor?
9              THE COURT:  Yes.
10             (Mr. Demik and the defendant conferred off the
11             record.)
12             MR. DEMIK:  Your Honor, Mr. Chase Alone wishes
13   to testify on this matter.  I don't know if you'd like to
14   do that in the context of his allocution or have me call
15   him as a witness.
16             THE COURT:  Well, let's resolve it at this
17   point.  So what we'll do -- do you need the investigator
18   for further testimony?
19             MS. POPPEN:  No, Your Honor.
20             THE COURT:  Do you need further testimony from
21   Mr. Fagerland on the stand?
22             MR. DEMIK:  No, Your Honor.
23             THE COURT:  Well, thank you very much.  You may
24   step down at this point.
25             You're welcome to be placed under oath there,
```

1    and you can certainly be seated during your testimony on

2    this, Mr. Chase Alone.

3            Let's move the microphone closer to him,

4    Mr. Demik, so we can get a clear record here.

5            Katie, would you administer the oath to

6    Mr. Chase Alone?

7                    **HENRY CHASE ALONE**

8            called as a witness on behalf of the Defense

9    herein, was sworn, examined, and testified as follows:

10           THE COURT:  Do you wish to inquire of your

11   client, Mr. Demik?

12                   **DIRECT EXAMINATION**

13           BY THE DEFENSE:

14   Q.   BY MR. DEMIK:  Mr. Chase Alone, did you want to add

15   something to the objection to paragraph 64 and 65 to the

16   PSR?

17   A.   Yes, Your Honor.  I would like to state that it

18   wasn't -- it wasn't I who -- that the detective who

19   concluded that G.R.N. harmed herself was Detective Andrew.

20   I was in the other room when she was being investigated.

21   And yet in a separate room, I don't know what she said to

22   him, nor could I have said anything for her to even state

23   what she states.

24           But it was after five hours, he came and said

25   she admitted to hitting herself with a hammer after her

1    having -- asking her multiple questions.  We did take her

2    to West Regional after that, so I don't -- I don't know

3    how 64 and 65 became a part of what I caused, when I

4    didn't have no access to her.  I couldn't tell her

5    anything, but just witness of what -- what the detective

6    told me.

7            So I -- I really don't know what to say about 64

8    and 65.  But it's there.  It's on the report.  And it was

9    used against me in trial.  I tried to testify during trial

10   for that reason.  I wasn't allowed to.

11           THE COURT:  Well, you had every right to testify

12   at trial.  We discussed that.

13           THE DEFENDANT:  Yes, Your Honor.

14           THE COURT:  I believe you made the decision,

15   because it was your exclusive right to testify or not.

16   You made the decision about testifying.

17           What else do you wish to say as to those

18   paragraphs 64 and 65?

19           THE DEFENDANT:  That -- is there a way we could

20   bring Detective Andrew in to testify?

21           THE COURT:  Well, that should have been done in

22   preparation for sentencing.

23           THE DEFENDANT:  I didn't get a chance to speak

24   with my attorney before -- for a while.

25           THE COURT:  What about that, Mr. Demik?

1          MR. DEMIK:  Your Honor, I wasn't given any

2     notice that Mr. Chase Alone wanted to call any witnesses.

3     I'm not sure what that would add, at this point.  I don't

4     know what to say.  It's been thoroughly explained to

5     Mr. Chase Alone what was going to happen today.

6          THE COURT:  Well, let me review some matters,

7     here.  These are trial exhibits, of which I take judicial

8     notice.  They are admitted through the testimony of G.R.N.

9     and other credible witnesses, law enforcement witnesses.

10          As to paragraph 64, which says on October 11th,

11     2017, G.R.N. was seen at Indian Health Services, Rapid

12     City.  She presented with a fractured wrist, fractured

13     nose, two fractured ribs.  At the time she was examined,

14     G.R.N. reported she was in a skateboarding accident.

15     However, medical staff did not believe her, so she

16     reported she assaulted herself with a hammer.

17          At the defendant's trial in this case, G.R.N.

18     testified she was beaten by the defendant approximately

19     two weeks before her medical examination.  The defendant

20     kicked G.R.N. and hit her multiple times with a hammer

21     because G.R.N. told him she liked a boy.  Due to fear of

22     legal action, Mr. Chase Alone did not allow G.R.N. to seek

23     medical attention for two weeks after the assault.

24          The testimony concerning your assault of G.R.N.

25     with a hammer at trial, I take judicial notice of it.  And

1    I take judicial notice of trial Exhibits 39, 42, 43, 44,

2    45, 46, 47.  All of those are photographs of G.R.N. taken

3    by law enforcement showing the remarkable and horrific

4    effects of your beating this young girl with a hammer.

5    She testified to it.  I find it to be credible.

6              As to paragraph 65, that says on August 21st,

7    2018, law enforcement was called to the home of Sally

8    Apple in Manderson, South Dakota.  Apple arrived home to

9    find several intoxicated individuals, including Mr. Chase

10   Alone and G.R.N..  Mr. Chase Alone admitted to hitting

11   G.R.N. several times in her face.  A witness advised

12   Mr. Chase Alone may have also kicked G.R.N. in the face.

13   Mr. Chase Alone's boots were inspected, and the right boot

14   was found to have blood across the top, which I believe

15   proved to be G.R.N.'s blood.  That's Exhibit 50, the

16   picture of boots with blood on it.  And 54 shows the

17   outcome of G.R.N. having been hit and kicked by the

18   face -- I'm sorry.  Hit in the face and kicked with boots,

19   the boots that show up in Exhibit 50.

20             The law enforcement testimony and G.R.N.'s

21   testimony on these points I find to be credible.  And

22   these -- the beatings described in those two paragraphs

23   appear to be fully supported by sworn testimony and

24   exhibits at trial, Mr. Chase Alone.

25             Do you have anything further on that?

1          THE DEFENDANT:  Yes.  We should have had Andrew

2     here so he could testify.  I've been having trouble with

3     the Pennington County Jail with not giving me my letter.

4     I still haven't received my attorney's letters that he was

5     just asking me before the Court started.

6          I really -- I mean I know what we're sitting

7     here for.  Yes, I understand.  But I've been really

8     misinformed on a lot of things of the evidence.  This is

9     still new to me, even -- I don't know how to -- I've been

10    asking for a polygraph test, a lot of things before trial.

11    None of that happened.  I asked to testify.  None of that

12    happened.

13         Everything that's here, I didn't get a chance to

14    read this for trial, even while I was sitting 15 months in

15    Pennington County.  A lot of this stuff is still new to

16    me.

17         THE COURT:  Well, it can't be too new to you,

18    Mr. Chase Alone.  You sat at that table in that chair

19    throughout the course of your trial.

20         THE DEFENDANT:  Yes.

21         THE COURT:  You saw law enforcement testify.

22    You saw G.R.N. testify.  Ms. Albertson, very experienced

23    criminal defense attorney, cross-examined those witnesses

24    on your behalf.  You saw these exhibits.  They were

25    displayed to the jury and to the public during the course

1    of your trial.

2              So as to paragraphs 64 and 65, you had all of

3    that information.  You saw it come in at trial, and it was

4    contested by your attorney.  It's not a surprise.

5              THE DEFENDANT:  Um -- that part is not a

6    surprise.  I understand it.  I wish Jennifer Albertson was

7    just a little bit more in letting me read what was in the

8    evidence.  I just didn't see it at the time.  But I seen

9    it at the trial.  And I understand it fully.

10             THE COURT:  Yeah.  Well, you have certain rights

11   to appeal your conviction, certain challenges you can make

12   to attorneys who, if you think they were ineffective,

13   you've got a constitutional right to challenge those

14   matters.

15             But as to this hearing on the objections to 64

16   and 65, the record is as I've described it.

17             Mr. Demik, are you asking for a continuance of

18   this trial to get Andrews here or anything?

19             MR. DEMIK:  No, Your Honor.

20             THE COURT:  Well, the value of that testimony in

21   the face of the overwhelming evidence at trial, which is

22   the basis of paragraphs 64 and 65, that witness could not

23   possibly create a conflict in evidence that would

24   undermine the government's proof of the facts in 64 and 65

25   by the greater weight of evidence in this hearing onto at

1    trial.  And I so find.

2            For that reason, I'm overruling the objections

3    to paragraphs 64 and 65 and to 129 and 130.  So objection

4    number five is overruled, based on this record.

5            Objection number six is as to paragraph 83.  And

6    it's the old paragraph 83, not the one that appears in

7    this present version of the presentence report.  I think

8    83 was deemed moot because you made a correct request of

9    the probation officer on the application of guideline

10   4B1.5, Mr. Demik?

11           MR. DEMIK:  Yes, Your Honor.

12           THE COURT:  Do you agree that the original

13   objection to paragraph 83 was moot and properly removed

14   from the presentence report?

15           MR. DEMIK:  Yes, Your Honor.

16           THE COURT:  Is there any further record to make

17   on objections five or six?

18           MR. DEMIK:  No, Your Honor.

19           THE COURT:  All right.

20           Now did you have any further defense objections,

21   Mr. Demik?

22           MR. DEMIK:  No, Your Honor.

23           THE COURT:  Well, having ruled on the

24   objections, I'm going to put the federal sentencing

25   guideline calculation on the record.

1          If we go to your presentence investigation

2    report, Mr. Chase Alone, I'm required now to place on the

3    record, as must every judge at sentencing, the guideline

4    calculation.  That calculation begins on page 10 of the

5    presentence report.

6          Count one, sexual exploitation of a minor, this

7    involves G.R.N..  every crime is given a base offense

8    level, which is the starting point of the guideline

9    calculation.  And here the base offense level for count

10   one is a 32.  Two levels are added as a specific offense

11   characteristic because your crime involved a minor who had

12   attained the age of 12 but was less than the age of 16.

13   G.R.N. was 15 at the time of the crime.  Two levels are

14   added to account for her young age.

15         The specific offense characteristic in the

16   commission of aggravated sexual abuse against G.R.N.

17   during the commission of count one ads four levels of the

18   specific defense characteristics for the distribution of

19   the video which you shot and communicated to G.R.N. via

20   Facebook Messenger.  That adds two levels.

21         The offense characteristic that your daughter

22   G.R.N. was under your care, custody, control, and

23   supervision at the time of the offense ads two levels.

24         Victim-related adjustment, she, G.R.N.,

25   constitutes a vulnerable victim for the purposes of the

1    federal sentencing guidelines.  So two levels are added.

2          The adjustment for obstruction of justice.  I

3    made a record on that with regard to the jail phone calls

4    and the credible testimony at trial concerning your desire

5    to have the laptop, which contained incriminating

6    information, made unavailable to law enforcement.  That

7    was unsuccessful.  But nonetheless, two levels are added

8    for the obstruction.

9          That gives an adjustment offense level for count

10   one of 46.

11         Count two, sexual exploitation of a minor

12   involving N.H..  the base offense level for that crime is

13   32.  Two levels are added because N.H. was 15 years old at

14   the time.  That accounts for the young age.

15         Specific offense characteristic ads two levels

16   because the commission of a sexual act did occur in the

17   process of your filming G.R.N. and the minor child N.H.

18   engaging in sexual activity.

19         Specific offense characteristic adding two

20   levels, again, is distribution of the exploitation of

21   these two minors engaging in sexual activity at your

22   direction.  That was sent to G.R.N. by Facebook Messenger,

23   so two levels are added to account for that.

24         Adjustment for your role in the offense, two

25   levels are added because you did obstruct justice, as

1    we've said on the record.

2         So the adjusted offense level for count two, the

3    sexual exploitation of N.H., is a 40.

4         There is under the guideline system an ultimate

5    many account adjustment.  And that creates a greater

6    offense level for count one of 46.  And there is an

7    increase of the offense level to account for count two.

8    That ads one level.  So the combined adjust3ed offense

9    level in paragraph 45 is a 47.

10        There is a Chapter 4 enhancement because you

11   also committed incest, count three, against G.R.N., on

12   multiple occasions.  And some of those are not charged in

13   count three.  There's no conviction for sexual assault on

14   a minor from the 2001 case, but the report did include

15   that enhancement.  Because as I said on the record, the

16   2000 case did demonstrate that there had been this prior

17   attempt.

18        So that's engaging in a pattern of sexual

19   activity, which is prohibited.  That brings the level to a

20   52.

21        No acceptance of responsibility.  You exercised

22   your right to trial.  I can tell you, Mr. Chase Alone,

23   there's no penalty to you at sentencing for exercising

24   your constitutional right to trial.  You had an absolute

25   right to go to trial, just as you have an absolute right

1    to appeal any part of this case after sentencing.  So it's

2    no negative impact on my decisions regarding sentencing

3    because you went to trial.  But there's no acceptance of

4    responsibility reduction under those circumstances.

5              The total offense level, then, is a 43.

6              Now, as to count three, the federal sentencing

7    guidelines do not have a guideline or an analogous

8    guideline for aggravated incest.  So we don't use the

9    guideline system for count three, aggravated incest.  We

10   use the factors set out in the sentencing statute, 18

11   United States Code Section 3553(a).  As I said, that's

12   congress's directive at sentencing for all judges, to

13   fashion enough of a sentence but not a sentence greater

14   than necessary, considering the factors that congress set

15   out in that statute.

16             The purpose of federal sentencing, congress says

17   in the law, it says I must consider the seriousness of the

18   offense, the need for punishment, the manner in which the

19   offense was committed, your childhood history and

20   characteristics.

21             Congress directs in that law that the sentence

22   must send a message to the larger community that there are

23   serious consequences for serious criminal behavior.

24             Congress also says the sentence is to prevent

25   you from committing future crimes and protect the

1    community.

2         I have to consider unwarranted sentencing

3    disparities, so that the sentence imposed under that

4    statute is not too severe or too lenient compared to

5    others in similar circumstances.  And I have to consider

6    your needs for rehabilitation and treatment.  And, of

7    course, I have to consider the federal sentencing

8    guidelines.

9         So that's as to count three.  It's basically a

10   discretionary sentencing requirement.

11        So that's the guideline calculation as set out

12   in the presentence report, which I have upheld.

13        Now, if we go to page 20 of your presentence,

14   you'll find that the guidelines also have a method of

15   calculating criminal history.  You'll see that in

16   paragraph 82.  Your total criminal history score is 7,

17   putting you in criminal history Category 4 on the

18   sentencing table.  The guideline calculation and the

19   statutory factors for sentencing begin at page 25 of your

20   report.

21        If you look at paragraph 109, it sets out the

22   maximum set by congress for these offenses.  As to count

23   one and count two, the counts involving G.R.N. and N.H.,

24   each of those counts carries a mandatory minimum term of

25   imprisonment of 15 years, with a maximum term of 30 years

1    on each count, as to counts one and two.  Count three, the

2    aggravated incest, carries a maximum term of imprisonment

3    of 15 years.

4         Paragraph 110 has the federal sentencing

5    guideline calculation.  For counts one and two, based on a

6    total offense level of 43 and a criminal history category

7    of 4, the guideline range for imprisonment on count one

8    and count two is life in federal prison.  Count three, the

9    guidelines are not applicable.

10        The guideline range, as calculated in paragraph

11   110, shows you that the guideline range for custody in

12   this case, Mr. Chase Alone, is 900 months, or 75 years in

13   federal prison.

14        No parole in the federal system.  We have what's

15   called supervised release, which is a period of

16   supervision after a custody sentence; to keep a person

17   under supervision to protect the community from future

18   criminal behavior, but also to address any rehabilitative

19   needs that you have.  By law, for counts one through

20   three, the term of supervised release is five years to

21   life on supervision.

22        Supervised release, unlike prison sentences,

23   supervised release terms run concurrently, that is at the

24   same time.

25        Now counts one, two, and three, those can be

1    concurrent -- that is running at the same time --

2    consecutive, or partially concurrent and consecutive.  So

3    that is a different setting in terms of the outcome of

4    imprisonment.

5            The guideline provision for counts one and two

6    is supervised release of five years.  Count three has no

7    supervised release provision under the guidelines because

8    the guidelines aren't applicable to aggravated incest.

9            Now, with regard to probation, with mandatory

10   minimum sentences, of course, probation is ineligible,

11   both under the statute and under the guidelines.

12           Guideline range for a fine, I have no intention

13   of imposing a fine.  The counts one and two, the maximum

14   fine is $250,000 on each count.  Count three, the maximum

15   fine is $30,000.

16           Now, there is a special assessment, which is

17   mandatory in every federal sentencing.  It's $100 due at

18   the time of sentencing on each count of conviction.  That

19   money goes into a National Victims' Assistance Fund.  So

20   I'm required as to counts one, two, and three, to impose

21   the special assessment for a total of $300 in special

22   assessments.

23           You'll see in paragraph 120 that the Justice for

24   Victims of Trafficking Act of 2015 would apply, and it

25   would require you under that law to pay $5,000 per count

1   under that statute.  But congress wisely created an

2   exception for people who are indigent; that is, they have

3   no financial ability to pay the special assessment under

4   that act.  And I do find under paragraph 107 of the

5   presentence report you are an indigent person.  And so I

6   will waive the required special assessments that are

7   described under the Justice for Victims of Trafficking

8   Act.

9          Paragraph 121 refers to another statute, the

10  Amy, Vicky, and Andy Child Pornography Victims' Assistance

11  Act of 2019, commonly referred to as AVAA.  And it

12  requires that in addition to any other special

13  assessments, that the Court shall assess an amount of not

14  more than $17,000 for a conviction of possession of child

15  pornography, not more than $35,000 for trafficking in

16  child pornography, not more than $50,000 for producing

17  child pornography.  I don't know what the government's

18  position is on the application of AVAA, but we can discuss

19  it.

20          And then the guideline range for a fine for

21  counts one and two is $50,000 to $250,000.  I'm not going

22  to impose a fine.

23          And then is there restitution requested in the

24  case?  I believe there is.

25          MS. POPPEN:  Your Honor, pursuant to paragraph

1    125, the United States is requesting restitution in the

2    amount of $3,000 to G.R.N., as well as $3,000 to Noah

3    Helper.

4            THE COURT:  All right.  Are those restitution

5    amounts contested, Mr. Demik?

6            MR. DEMIK:  For the record, yes, Your Honor.

7            THE COURT:  All right.  Well, at sentencing,

8    Ms. Poppen, when we get to your advocacy for sentencing,

9    I'd need to know the basis for the request for the $3,000

10   on count one and count two as to those victims.  When

11   there's a challenge, the United States needs to support

12   the requested restitution amounts by a preponderance of

13   the greater weight of evidence.

14           Well, Ms. Poppen, is that an accurate statement

15   of the federal sentencing guidelines and the federal

16   sentencing statute as to count three?

17           MS. POPPEN:  Yes, Your Honor.

18           THE COURT:  I'm not going to ask you to agree

19   with any part of this determination and the federal

20   sentencing guideline calculation or the application of

21   3553(a) to count three, Mr. Demik.  The your objections

22   are preserved for the record.

23           Well, Ms. Becker, this is a complicated case.

24   You didn't sit through the trial, which of course is not

25   in any way necessary.  I presided over it, and I can tell

1    you this presentence investigation report is very

2    thorough.  It's accurate.  I've overruled the objections

3    to it, and I'm adopting it as written.  Thank you for the

4    report.

5           It is time to turn to you, Mr. Demik, and

6    Mr. Chase Alone and anyone who wishes to speak on his

7    behalf concerning an appropriate sentence in the case.

8           MR. DEMIK:  Thank you, Your Honor.  Rochelle

9    Breckenridge would like to speak.

10          THE COURT:  Of Course, if you would please come

11   forward to the podium and introduce yourself, Rochelle, so

12   Sheri has your name in our record.

13         Good morning.

14         MS. ROCHELLE CHASE ALONE:  My name is Rochelle

15   Chase Alone.  I'm his wife.  I don't know what else to

16   say.

17         But I know my husband has been really sick

18   all -- ever since he's been in jail.  He's been -- he

19   called me.  He's really sick, and he's been throwing up

20   blood, coughing up blood.  It's been off and on.  And I --

21   me and his sister both called the jail, and we both

22   told -- got after them and told them they needed to do

23   something about that.

24         He -- I've been putting a lot of money on his

25   books, because I have a part-time job at Hilton Garden

1    Inn, because I was really struggling.  I couldn't keep up

2    with the bills.  I was homeless.  So I -- so my old

3    landlord, I owed him $2,000.  So I paid him off, and he

4    let me back in the place.  Because he's a private owner,

5    and he hates to see me -- he hates to see us on the

6    street.  So I've got a place.

7              But I'm asking if the courts could give him 15

8    years.  I don't -- it's really hard to say, because I

9    don't want to cry right now, but he -- maybe you could

10   give him like supervised release, like make probation

11   after that, something -- maybe give him less time.

12             I know this has been hard for him and he's been

13   really sick.  And he needs to go in the hospital to get

14   this bleeding stopped, because it could go through his

15   heart.  And I don't want him to die.

16             And the state doesn't mind if he -- because I

17   talked to his lawyer, state lawyer, and she said that they

18   don't mind if Henry goes to the hospital.  But she said

19   he's on federal hold, it's up to federal -- but they know

20   he needs to go to the hospital to get this bleeding taken

21   care of.  I know his ear's infected, and I know he fell

22   off the bed a couple times.

23             And I know that, like they said, they've been

24   taking his mail.  He hasn't been getting any of his

25   letters.  And I've been sending him stamps, and he hasn't

1     even gotten them, but finally he got his stamps.

2              And I've been supporting my husband through this

3     whole thing.  And I just don't want to lose my husband,

4     because I don't want him to die, Your Honor.  And right

5     now I got threatened at my job, and I've been -- I'm -- I

6     was about to walk out of my job because the way they're

7     treating me.  I had to walk home in the cold.  And I --

8     hairline fractured my arm.  And I have to have surgery on

9     my -- I have to have bone spur surgery on my foot.  And

10    I've been in a cast.  I just got out of the hospital like

11    a week ago.  I've been in the hospital.  I had pneumonia,

12    bronchitis really bad.  I couldn't breathe.

13             Henry, I know Henry -- my husband was worried

14    about me.  He didn't want me to die.  He worried because I

15    told him I was really sick and I had to go to the

16    hospital.  So I missed a week and a half of work because I

17    was in the hospital.

18             And I might be having surgery on my hand here,

19    because they found a bone spur on my wrist of my bone.  So

20    I just got a call from my doctor this morning, said that

21    they're -- I might be having surgery on my hand.  At Black

22    Hills Orthopedics and Spine.  But I'm really having it

23    hard right now, Your Honor, and I might lose my job

24    because I can't keep up with the bills.

25             I'm really struggling right now.  My family

1    doesn't want me anymore.  My family hates me.  They don't

2    care about me anymore.  I don't have no support.

3         I miss my husband a lot, and I even miss my son.

4    But I'm really fighting for my son.  But I don't know if

5    it's going to work out.  But I'm really -- because the

6    government is denying my parental rights.  But my lawyer

7    is trying to fight it.  But they're using my disability

8    against me.

9         So -- I just don't have no support.  The only

10   one that's supporting me is my husband.  But I don't have

11   no family at all.  None of my family won't talk to me.

12   The only one that talks to me is my brother.  But, you

13   know, he has his own life, you know.  He lives in

14   Nebraska.

15        So I know I'm really struggling.  I already had

16   so many deaths in my family, ever since -- I had four

17   deaths in my family since Henry, my husband, went in jail.

18   I went up to Eagle Butte for my cousin's wake and funeral.

19   And I think that was the biggest mistake I made because of

20   my family treating me mean.  I didn't have no ride back.

21   I had to hitchhike back trying to find a ride back to

22   Rapid.  It was the biggest mistake I went up there.

23        I don't have no support.  I'm struggling trying

24   to keep up on all those bills.  I owe $6,000 to the state

25   for a lawyer that didn't even help me.  I got cut off

1   Medicaid and Medicare because I have a part-time job, and

2   my health is -- my -- so -- but Sioux San is paying for my

3   hospital bills.  But is this -- this surgery is going to

4   take a lot.

5          And I am going to counseling.  I am going to --

6   helping me, you know.  His -- my counselor's not happy

7   what I'm going through, you know.  And it's just I have a

8   car, we have a Dodge Durango, and I can't even drive it.

9   I'm keeping it up and running so they won't take it.

10  So -- but United States Marshal going to be out of a job

11  because I'm -- it's hard for me to get around because of

12  my health.

13         And Social Security.  I really fought Social

14  Security because they took -- they took -- I'm only

15  getting $700 a month now from Social Security, because I'm

16  paying the statement for my Medicaid.  And for child

17  support, I'm paying that, too.  I'm almost done with it,

18  but not really.  I still have -- I think I still have $600

19  more left on my child support.

20         But I'm really struggling, Your Honor, and I

21  can't  -- I don't know what I'm going to do without my

22  husband.  I don't want to lose him.  But I wish the

23  Court's considering at least give him less time and at

24  least put him on probation, because I know he does really

25  good on probation.  And he -- I don't think he deserve

1    jail.  I think he deserve treatment.  Because I think

2    treatment is a lot better, and that's what he wants.

3          And I understand that, because even -- I don't

4    think even his state lawyer doesn't think he's going to

5    last in jail because of his health.  He needs to get that

6    bleeding stopped before he -- before it goes through his

7    heart.  Because I know this, because I lost my uncle back

8    in 2014 because he was bleeding in his stomach and they

9    didn't catch it in time and he died from it.  It went to

10   his heart.  And I don't want that to happen to my husband.

11         I know his family is really worried about him.

12   I am too.  So I thank you, and thank you for hearing me

13   out.

14         THE COURT:  Well, thank you, Ms. Chase Alone,

15   and for the letters you've written to me.  You've been

16   very clear about these terrible struggles.

17         I can tell you that the Bureau of Prisons has

18   very effective healthcare.  I've toured federal Bureau of

19   Prisons facilities with hospital care.  Bureau of Prisons

20   deals with inmates who have incurable stage-four cancer

21   all the way down to people who have, you know, fractures

22   or some minor problems.  So your husband will be evaluated

23   medically.  He's going to get proper medical care in the

24   Bureau of Prisons; I can assure you of that.

25         This is a terrible day for you, and I think you

1    are very brave to come and express yourself this way.

2    Your husband needs to hear these things, I'm sure.  But

3     -- all I can do at this point, given the length of

4    custody with mandatory minimums and the maximums

5    available, is hope that you find your way through life

6    now.  Because Mr. Chase Alone is going to federal prison.

7    But thank you for speaking.  And I hope things go better

8    for you.

9              MS. ADELINE CHASE ALONE:  Good morning.

10             THE COURT:  Would you introduce yourself so

11   Sheri has your name?

12             MS. ADELINE CHASE ALONE:  My name is Adeline

13   Chase Alone.

14             Hi.  I'm not able to fully know about everything

15   that's going on here, but I showed up today to show

16   support for my brother Henry.  I really don't know what

17   else to say.

18             THE COURT:  Well, just showing support and being

19   present, I'm sure, is very encouraging to him.

20             MS. ADELINE CHASE ALONE:  Yeah.  I'm not

21   allowed -- it's not that I'm not allowed, but I'm not able

22   to be involved with a lot of my family members, due to my

23   own child's disability.  So my time is always taken up.

24   But I'm here to support my brother and ask for leniency on

25   him, I guess, if that's how you would say it.

1          THE COURT:  That's how you would say it.

2          MS. ADELINE CHASE ALONE:  Okay.

3          I guess that's it.  Because I really don't know

4     what else.

5          THE COURT:  Well, I'm pleased to hear you don't

6     know all the details of this case.  It's very --

7          MS. ADELINE CHASE ALONE:  I tried to come to the

8     Courts and stuff.  But due to my son, like even now, when

9     I kept going in and out, I had to deal with my son's

10    school and other things, so I had to keep leaving.

11         THE COURT:  Well, that's your priority in life,

12    is your son.  And I respect that.  Thank you.  Thank you

13    for speaking and showing your support for your brother.

14         MS. ADELINE CHASE ALONE:  Okay.  Thank you.

15         THE COURT:  Thank you.

16         Mr. Demik, Mr. Chase Alone, of course I'm sure,

17    Mr. Demik, you've made clear the Fifth Amendment rights in

18    speaking.  But Mr. Chase Alone has every right to be

19    heard, whatever he wishes to say.

20         Mr. Demik, do you wish to go forward first?

21         MR. DEMIK:  I believe Mr. Chase Alone would like

22    to address the Court.

23         THE COURT:  That's perfectly fine.

24         Mr. Chase Alone, I would be pleased to hear from

25    you.

```
 1              THE DEFENDANT:  Your Honor, thank you.  Thank
 2    you to my wife and them for coming to support me.  That
 3    opened my eyes to a lot.
 4              Also, for the past 15 months of being in
 5    Pennington County Jail, I've tooken up a lot of Bible
 6    study.  I realized a whole lot that -- touching with God
 7    meant a lot.
 8              I've also realized that, you know, it's -- I
 9    want -- I want to be able to heal.  I've accepted a lot of
10    things that was wrong with my life, that I let influence
11    me to do even more.  And I realized a whole lot that, you
12    know, it's not about denying anything.  It's all about
13    accepting.  Just as they taught me in men's AA, accepting
14    what you go through.
15              And so I have -- Your Honor, I have had
16    15 months to think about this real good and long about
17    what has gone from my life.  I know my wife and my sister,
18    they asked for leniency.  I did it, too.  I asked for
19    leniency.  But I also want to put it to where my daughter
20    doesn't have to worry about going to a store and meeting
21    up with me later on.  Or I don't want to -- I don't want
22    her mom and them to feel that they have to hide from
23    someone.
24              So I ask the Court if they would accept my death
25    sentence, instead, of life in prison.  I have -- I don't
```

1    want my daughter to feel scared or worried.  I don't want

2    anybody to be worried of someone like me.  I would rather

3    accept -- you know, just accepting this.

4            I read a lot of cases that involve mine, and a

5    lot of cases that -- where the victim in those cases were

6    worried, and the person had a hard time alive.  Me, I

7    don't want that.  I don't want my daughter to feel scared

8    and worried about her dad showing up 20 years later or 50

9    years later down the road.  I would rather just accept my

10   responsibility to the fullest and accept that death

11   sentence.

12           I accept it, and I prayed to God for 15 months

13   asking him what would be -- what would be my reaction on

14   my sentence day.  What can -- what can I ask for that's

15   going to satisfy the government?

16           Because I know even after I get done with this

17   sentence, whether it's 75 years or even 15 years, I'm not

18   going to feel the same.  I will get the treatment.  I will

19   go through all that that's required to me.  I'll do it to

20   the fullest of its extent.

21           But I really honestly can't just live with

22   myself.  I see myself as being my daughter's worry, or her

23   mom's worry, or someone else's worry.  I just -- I would

24   rather just end all of it and just be able to go.

25           I always hear people say they -- it would be

1    better to meet our Creator.  And I would love to meet

2    that.  I would love to meet him and ask him for leniency.

3    That's -- that's where I really want to go.

4              I understand that there's -- it was a lot.  It

5    was a lot that was said that -- I can't -- I couldn't even

6    begin to start.  But what I can ask is -- I would like to

7    be an example to the rest of them.  I would like to be a

8    perfect example so that no one else would ever want to do

9    this again.  That's what I really want to be.

10             In Pennington County, I realized a lot of people

11   in there were reaching out for God.  We started a Bible

12   study, and they -- they made me the foreperson.  I always

13   told them, you know, really, honestly, I don't -- I really

14   shouldn't have this position to start our prayers.  But I

15   did.  I did.  I didn't know how -- what to read.  But I

16   read.  I read the Serenity Prayer.  And I read it, and I

17   said, Wow, this really has a whole lot of meaning to it.

18   And every day we read the Serenity Prayer over and over.

19   Every night.  Even when I get back, we'll read it again.

20             So I -- I asked God for 15 months, what -- I

21   can't change a lot of things that happen, even with this

22   case.  So I have to accept.  And I accept it.  I honestly

23   would like to accept this death sentence.  I really would.

24   It's -- it's a blessing.  It would be a blessing.  It

25   would be something that I would love, and I would gladly

1     accept it.

2              And I just wish to be a better person in the

3     next life.  And maybe I can, then.  Just -- I'm just

4     tired, you know.  For 12 years I've been trying to get --

5     to be a better person.  Because I wasn't, growing up.  I

6     was fighting people.  I was drinking and neglecting my

7     children over alcohol.  I -- I loved drinking, because my

8     mom died.  I didn't really care for life.  I didn't care

9     for it.  I was actually looking for alcohol as my way out.

10             And I realized alcohol wasn't the answer.  It

11    just caused more problems.  It caused a lot.

12             For 15 months in Pennington County, I say, yeah.

13    You know, this -- even when -- 75 years, 15 years, five

14    years, I get out on supervised release, or whichever the

15    case may be, I'm going to realize that I don't want my

16    children or their mothers to feel worried or scared to go

17    to the Wal-Mart because I might be there.  I don't want

18    them to feel scared or worried after have to walk home

19    that I might be there, if I just happen to be at the right

20    place at the wrong time or wrong place at the wrong time.

21             So I just don't want to be here on earth no

22    more.  Earth is okay.  I like it.  But I want to start

23    over.  And I want to start over with meeting God, and

24    hopefully he grants me a second life.  If not, maybe I'll

25    come back as an animal, you know.  A lot of my friends ask

1   me in Pennington County, gee, Henry, why would you want to

2   do that?  Why would you want to ask for that?

3            I believe it's the right thing to do.  I believe

4   it is.  And I know people think it's wrong that -- it's

5   probably wrong to them.  But for me it's right.  It's just

6   what I want.  But I'm not suicidal.  I just -- I just

7   feel -- I feel happy to know that I get to go see him.  I

8   do.  I really do.  I feel happy that I get to go see our

9   Father.  I just hope he accepts me.

10           That's all I have to say.  And I just hope that

11   you can consider that for me and grant me that, is what I

12   want.  I really, honestly want it.

13           THE COURT:  Mr. Chase Alone, you've done a lot

14   of reflection and work, thinking about your life since

15   you've been in custody these 15 months.

16           There is, of course, no death penalty in this

17   case.  The guideline recommendation of 900 months is 75

18   years.  You're 36 years old.

19           So I take you seriously.  I mean you've been

20   very reflective about these things.  And you've written to

21   me making it clear that you've worked through a great many

22   things in life, and you've found both a spiritual journey

23   and a reason to go forward, and helping others along the

24   journey as well, inmates, with you.

25           So I thank you for speaking today.  I respect

1      your views.  I believe they're clearly thought out.  And

2      they're not -- not the product of distress or tension and

3      trauma of this particular sentencing day for you.  So I

4      thank you for speaking.

5                  THE DEFENDANT:  Thank you.

6                  THE COURT:  Mr. Demik?

7                  MR. DEMIK:  Nothing further, Your Honor.

8                  THE COURT:  Very well.

9                  Ms. Poppen, the prosecution position, please?

10                 MS. POPPEN:  Thank you, Your Honor.

11                 I'm going to start out by making a few comments.

12     And then G.R.N.'s present, as well as Ms. Franchetti and

13     some other DSS workers.  But I think it's important that

14     we also focus on G.R.N. here today and kind of how that's

15     impacted her and how it will impact her for the rest of

16     her life.

17                 Unfortunately, G.R.N. was sexually abused by

18     every male adult father figure that she's had in her life,

19     including the defendant.  The sexual abuse that she

20     experienced was chronic, it was longstanding, and it was

21     very traumatic.  However, the abuse inflicted upon G.R.N.

22     by the defendant, Henry Chase Alone, far outweighs the

23     abuse that was inflicted on her by Ben Rowland, her other

24     abuser.

25                 In many meetings with G.R.N., she would tell us

1    about how she just quit screaming when he would abuse her

2    because he would tell her to shut up and to take it.  And

3    so her screams were silenced at that point.

4            In the summer of 2016, G.R.N. was placed with

5    this man, whom she had never met, whom she had no

6    relationship whatsoever with, and whom she had never seen

7    before.  She had come from a place where this relationship

8    was a new opportunity.  It was supposed to be a safe

9    haven.  It was supposed to be a place where she could seek

10   refuge from a terrible, abusive environment; where she

11   could learn how to be a kid, a teenager; learn to

12   experience things that all young children should be able

13   to experience.  And much importantly, she was supposed to

14   be able to just have a life, a life outside of all that

15   trauma that she was leaving behind.

16           But instead, the defendant took that from her.

17   And this was a conscious decision.  This was a thought-out

18   decision.  This was repeated many, many times.  As G.R.N.

19   testified, hundreds of times this man sexually abused her,

20   from the time she started living with him until August

21   of 2018.

22           He beat her.  He would sexually abuse her by

23   holding a knife to her throat, by choking her.  She's told

24   us where when she was starting to go to Central High

25   School, she would break down because of all the noise,

1   because this brought back when he would yell at her and

2   choke her.  She has significant post-traumatic stress

3   disorder from this man.

4          The amount of manipulation that he put on her is

5   immeasurable.  And the Court was able to hear also this

6   manipulation by Ms. Breckfell, the manipulation that he

7   had against her in the jail phone calls, where he would

8   beat her down -- and this was much like what he did to

9   G.R.N..

10          The abuse inflicted upon G.R.N. has no doubt

11  ruined a good portion of her life.  Her childhood, her

12  teenage years.  It's simply changed and forever will alter

13  any relationship that she has with another man in her

14  life.  He did take away her innocence, and it's going to

15  cause her just a lot of questions in the future.

16          And then not to mention what he has also taken

17  from G.R.N., which is her young son, X.  And then the

18  further impact that this will have on X. if and when he

19  does learn of the circumstances of his arrival in this

20  world.  The social impact on him, the physiological impact

21  on him, all of that is going to be a challenge for this

22  young man.

23          And this is something that G.R.N. experiences on

24  a day-to-day basis.

25          She gave up her child, and he is in an adoptive

1    home.  And this is something that G.R.N. had struggled

2    with and continues to struggle with.

3             What's another aggravating factor in this case

4    is that he was prosecuted for an ARISB, assault resulting

5    in serious bodily injury.  And at the time he was on

6    probation and/or supervised release was at the time that

7    he was committing these acts against G.R.N..

8             And so he would come to our office, as G.R.N.

9    was the victim in another case, and he would put on this

10   front and this manipulation to us.  Meanwhile, he was

11   doing all these horrific and gruesome things to his very

12   own daughter, his biological daughter.

13            At the time that this was occurring, the United

14   States District Court was expending resources trying to

15   rehabilitate him, and he was doing nothing.  He was doing

16   the opposite.  This shows that this isn't someone that

17   would benefit from a short prison sentence followed by a

18   lengthy rehabilitation sentence.  That is not the case.

19            Henry has also affected G.R.N. because it caused

20   her to make up stories, like the hammer incident.  Well,

21   Detective Andrews was one of the detectives that didn't

22   believe Henry, that didn't believe G.R.N..  and when push

23   come to shove, G.R.N. ultimately said, well, I was beaten

24   with a hammer.  The part that she left out was that the

25   defendant was the one that inflicted these injuries on

1    G.R.N..

2          G.R.N. has scars on her feet, on her arms,

3    pretty much on every extremity of her body because of him.

4    And this is -- she's shown these injuries to her.

5    However, the exterior injuries are far less than the

6    internal injuries.

7          And if G.R.N.'s willing and able, I do believe

8    she's going to offer to the Court kind of some of --

9    listening to all the sentencing and what that's had --

10   what reflection she has on that.

11         She was forced to lie in that situation, in

12   October of 2017.  She was beaten by Henry with a hammer.

13   And she had broken ribs.  She had a broken arm.  She had

14   issues going on with her face.  Bruising.  And he fed her

15   with alcohol and marijuana in order to quiet her.  And

16   then when it became too much, he then allowed her to go to

17   the hospital.

18         But it was him who contrived the story about she

19   had fallen in a skateboarding incident.  It was he who

20   made up this elaborate scheme.  And the medical doctors,

21   they're far more experienced at that than him, and they

22   knew that, no, this is indicative of nonaccidental child

23   abuse.  And it was.  And then on top of that, she then has

24   to stay at Rapid City Regional Health for a couple of days

25   because of the trauma to her psyche that that all did.

1          Making her lie was another form of manipulation,

2     another way that he could silence her in order to get what

3     he wanted.  And then there was, as detailed in the

4     presentence report, he does have outstanding charges

5     related to a minor child named H.C.A.J.  When that all

6     happened, G.R.N. couldn't say what had actually happened,

7     because that would get her father in trouble.  And so then

8     she, then, turned into a suspect of that.

9          So here is this child, G.R.N., who is turned

10    into a suspect involving another crime that she had

11    nothing to do about.  And it was only until she started

12    receiving the treatment and the therapy that she needed

13    where she did make a disclosure about what had happened to

14    H.C.A.J.

15         Your Honor, the United States is asking for a

16    sentence of 75 years in this case.  It's a guideline

17    sentence.  And if I could ask for more, I would ask for

18    more.

19         When I look back at the cases that this Court is

20    familiar with in sentencing offenders, there's one case

21    that stands out in my mind, and that's Chance Williams.

22    Chance Williams sexually abused his 5-year-old daughter

23    until the time she was approximately eight, I believe.

24    This Court sentenced him to a term of 60 years

25    incarceration.  However, when you put the two cases

1    together, there's still some more aggravating factors that

2    this defendant has over Mr. Williams.

3         There was -- G.R.N. was subject to far more

4    violent beatings, broken bones, and that's outlined in

5    paragraph 128 in which the presentence investigator writer

6    has noted that this would be a ground for upward departure

7    based on the horrific nature of these injuries.

8         The defendant, up until now, has really not

9    accepted any responsibility.  There's still been no

10   apology to G.R.N., no apology as to how this is going to

11   affect her or their son.

12        In addition, there was not the form of abuse

13   towards her pets, towards her animals.  Knowing G.R.N. for

14   the past three and a half years, I've known that she loves

15   animals.  And she took care of animals.  And in fact, when

16   no one would take care of an animal, she would take care

17   of the animal, to make sure that it didn't starve.  And he

18   took her guinea pigs and threw them up against the wall

19   and killed them.  And then he kicked her cat, and the cat

20   never came back after that incident.

21        These were something that -- some items, worldly

22   items that meant a tremendous amount to her, and he killed

23   those and destroyed those so that she wouldn't have those.

24        In addition, what's distinguishing from this

25   case and the Chance Williams case is there's video

1    evidence, not just still imagery, like in Chance Williams.

2          With regard to aggravating factors as just the

3    situation that this was G.R.N. that this happened to, and

4    she's got a background like none -- no one else, in that

5    she was abused by her stepfather and then abused by this

6    man. Based on those aggravating factors, I believe that he

7    should be sentenced to term of custody of 75 years.

8          That is all I have to say, and I am going to

9    check with G.R.N..

10          THE COURT:  Thank you, Ms. Poppen.

11          MS. POPPEN:  Thank you, Your Honor.

12          THE COURT:  Good afternoon, G.R.N..

13          G.R.N.:  Hi.

14          Okay.  Everything that Megan said didn't

15    describe everything.  And I still live in fear.  And not

16    only that, the part about my son.  The my son's only one,

17    and I love him to death.  I mean there's no guarantee that

18    I will ever stop loving my son.

19          And throughout the time he was having visits

20    with me, when I look at him, he's happy.  He's a happy

21    child.  I mean everybody in my treatment facility just

22    loved him, and I loved that.  And he loves attention.

23    And, you know, my son is just amazing, being in my world.

24          But the saddest part is that he reminds me of

25    his father.  And every time he gets angry because he's

1    hungry, it's scary.  And there was many times I had to

2    think, because what if one day I'm trying to put him in

3    his car seat and I end up hurting my son?  And I don't

4    want that.  I never did.

5           Growing up, when I was getting sexually abused

6    by my stepfather and mistreated by my mom, I promised

7    myself that I won't ever let my kids go through this.  I

8    kept that promise.

9           And I -- with the help of my treatment, I mean

10   they're the most amazing place ever.  But I'm just -- I'm

11   usually scared.  And to me -- I am scared right now.  I'm

12   scared so bad.  And I'm filled with hatred after Henry did

13   those things to me.  In treatment, I became so aggressive

14   towards my other peers.  I threw chairs.  I threatened to

15   kill myself.  There's many attempts I tried.  I wanted to

16   run because I wanted to see my son.  I got into a

17   restraint.

18          And I've never been that aggressive after him,

19   in part that my life is not going to be the way it is,

20   because I'm almost 18.  It's in March.  And it's kind of

21   sad because all I ever wanted was a parent or somebody

22   just, you know, to treat me as a kid, you know.  I don't

23   have to worry about the fact that I'll get hurt or when

24   I'm going to come home after school or find beer cans

25   everywhere.

1          But sadly, that never did happen.  And I have to

2     learn to live on my own.  And I'll be going to an

3     independent living apartment, so I'll be working to get a

4     lot of things done to keep myself occupied so I can see my

5     son when he's 18.

6          But I'm not going to live my life in fear of a

7     lot of things that could possibly happen to me.  Because

8     to me, they're only people.  He's just a person.  He's no

9     one above me.  He's not even God himself, or so he claims.

10         And I'm not going to sit there and just be

11    scared for the rest of my life.  I mean I -- it does have

12    its impacts on it, but I'm not going to live in fear;

13    because he's out of my life.  Rochelle's out of my life.

14    The rest of his family's out of my life, and I like to

15    keep it that way.

16         I just -- I do ask for 75 years or more, because

17    I'm trying to keep my son safe.  I asked to change his

18    name.  I asked for him to be hidden.  No one on my side of

19    the family or his who are the so-called, you know, good

20    placement for him, to not be contact.

21         Because Henry has a way of scaring things out of

22    people.  He did that to me.  And as much as I tried to

23    lie, but he scared me so much.  That's why my son, I don't

24    know where he's at.

25         And the part of getting into relationships and

1   seeing like, for example, a boyfriend around my age, I

2   still kind of am scared to approach boys my age.  In our

3   home there's Group Star, Group Independence, which is the

4   group I'm in.  And there's Group Phoenix.  And there's a

5   boy there I like, but it was so hard for me to just look

6   at him because -- in fear of my dad's going to come after

7   me.  And if he sees me liking a person, I get scared.

8          But I kind of learned to know that he's not

9   there no more, and now, you know, I believe -- well, me

10   liking boys around my age is like a power of me getting my

11   power back from him and doing the things without being

12   scared.

13          I mean I could have stayed over there on the

14   other side of the state along with where my son's at.  But

15   I chose to live here because this is more likely a home;

16   even though most of the bad stuff that happened to me for

17   over most of the years of my life is here.

18          But it's the only thing I have close to my son,

19   because Regional Hospital is where he was born.  And plus

20   I got my family here, my mom and my brothers.  And they're

21   the only people I have left, because my son's away.

22          And -- I don't know.  Henry impacted me a lot.

23   I mean -- I have to live with my scars.  And they hurt

24   whenever I think about him.  And I think that my leg's

25   broken or something, I think that I'm going to get killed

1     and I have to watch my back.

2              And the part where he killed my guinea pigs

3     and -- I just have got to live with that guilt because I

4     couldn't save them.  And they only mean a lot to me,

5     because at least they listen and at least they know how to

6     comfort me.  But he took that, and it's hard.

7              And I'm kind of really -- I'm really protective

8     over a lot of things.  And I kind of realize, you know,

9     that animals help me a lot, because they calm me down.

10    And I think that's the best option for me, is getting a

11    therapeutic pet to help me.

12             But I've been doing pretty well.  And the reason

13    why I attend to these court hearings is because I want to

14    show him I'm no longer scared, even though right now I'm

15    bawling my eyes off right here in front of you.

16             I'm just -- I'm going to live the rest of my

17    years of my life happy.  I want to go to college.  I want

18    to join the military, maybe go to the air force, because I

19    heard it's fun.  And I just want to show that, you know --

20    be example to other kids who are going through the same

21    things as me.  And be example for my son, so he doesn't --

22    because in most cases when children get adopted out, they

23    think that their parents are deadbeat people who just care

24    nothing but the drug or the alcohol or just doesn't want

25    to give two craps about them.

1          Well, I want to show my son I did what I had to

2    do to keep me and him safe.  And I wrote a letter for him,

3    for when he turns 18 and he wants to know where he came

4    from.  I gave him the back history of how he came to be

5    and who his father is.

6          And I advised him to not look for his father,

7    because I know surely he's going to be wanting to know

8    that.  And I advised him not to, or anybody on his side of

9    the family.  And to just only know that, you know, his

10   uncles and his mom and his grandma are okay, but, you

11   know, I'm still trying to learn trust with them.

12          But I just -- I feel really better talking about

13   it and expressing how I feel in front of him.  I want him

14   to know that, you know, I -- I'm not scared of him no

15   more.  And that I thank him for being part of my life, but

16   at the same time, I don't.  And that I just want him to

17   know that at least I got to meet my father, and I've been

18   wondering most of my years.  And I just want him to stay

19   away.  And that's all I ask.

20          But I don't want him -- I don't want him out of

21   jail.  And this may sound really disturbing and crucial,

22   but I want him to die in jail.  And that's just honestly

23   how I feel.

24          But -- all I've got to say is that I'm really

25   happy that you guys did this for me.  And right now,

1    sitting over back there by Deb and them, and I was

2    shaking.  I'm scared.  And I don't know if I'm in a panic

3    mode or something.  But really, I'm okay.

4              That's all I have to say.

5              THE COURT:  G.R.N., I've listened to thousands

6    of victims over the years.  You're so brave.  And you're

7    so clear in your thinking.  I really admire your ability

8    to speak about these things and to talk about them here.

9              And last time you were here you were a witness.

10   And now you're sharing with all of us, including your

11   father, what your life is now and what your plans are.

12   And that's a very beautiful and important thing for you to

13   be able to do.

14             I have great respect for the life that you've

15   decided to live now.  And I -- you know, judges have very

16   little power to make things right in life.  But just know

17   that along with a lot of other people who have been

18   involved in this case, we really respect you and really,

19   really wish you the best, the life that you want to live

20   going forward.

21             I wish you success in that.

22             Well, thank you for speaking in this hearing

23   today.

24             Good morning.  Good afternoon.

25             MS. DEB FRANCHETTI:  Yeah.  Good afternoon.  I'm

1    Deb Franchetti.  I work at Child Protection.

2             THE COURT:  Thank you for writing.

3             MS. DEB FRANCHETTI:  I've worked with this

4    family for numerous years, and I've seen the pain, the

5    manipulation.  And I'm obviously very nervous and

6    disheartened by the actions of Mr. Chase Alone.

7             I saw more manipulation today, and it's -- it's

8    disgusting.  Nobody sat down with G.R.N. and said would

9    you like a little bit of pain or a lot?  She didn't get

10   that.  That's a luxury.  Nobody got to sit down with her

11   and say a rape or lose your child?  A hammer or a

12   screwdriver?  She didn't have that.

13            She does now.  She will never love the way

14   people love.  She will never walk the way people walk.

15   She will never see a rainbow the way that we do.  And I

16   don't even think apology at this point would take care of

17   that.

18            I wrote in my letter that she was broken.  But

19   we all are.  Henry is broken.  Henry is the broken one,

20   and his spouse, and anyone that thinks that this is all

21   okay.

22            So I wish Henry a very long, painful life in

23   prison.  And I am hopeful that he gets the maximum.  And I

24   hope that G.R.N. can teach the rest of us how it is to

25   rebuild from everything you took from her.

```
 1                    And I hope Rochelle gets the services she needs.

 2                    And I hope that Henry gets the medical

 3      treatment, so that he can live in pain, like he has

 4      inflicted on his own daughter.

 5                    And that's really absolutely all I have to say.

 6      Thank you.

 7                    THE COURT:  Thank you.

 8                    MS. POPPEN:  Thank you, Your Honor.  That's all

 9      we have.

10                    THE COURT:  Well, let's take up what I view to

11      be the least important matter first.

12                    The request for restitution of $3,000 for G.R.N.

13      and $3,000 for N.H., the defense objects to that.  The

14      government has to prove by the greater weight of the

15      evidence here or in a hearing on restitution what those

16      figures are and what support there is for them.

17                    Given the probable sentence in this case, I

18      don't know to what extent those are healing or the

19      restitution amounts that are of consequence.  You're going

20      to have to tell me about this, Ms. Poppen.

21                    MS. POPPEN:  Your Honor, it was my understanding

22      that the $3,000 was the minimum amount that the Court

23      could give pursuant to the statute when there is a crime

24      such as this nature.  And I believe the intent behind it

25      is to compensate those victims for the use of their
```

1    identity in such production of pornography.

2            THE COURT:  You're talking about the AVAA

3    statute?

4            MS. POPPEN:  Yes.

5            THE COURT:  Oh, that's a completely different

6    matter.  There isn't restitution in the usual sense.  It's

7    an assessment under AVAA.

8            MS. POPPEN:  Well, that was my understanding.

9    And so I may be mistaken.  But I would agree with the

10   Court that this is the least important thing of importance

11   today.

12           THE COURT:  Well, let's sort this out.  We've

13   had a very few number of cases since the AVAA statute took

14   effect.

15           If we look at the presentence investigation

16   report, you'll look at paragraph 125, which advises that

17   Mr. Chase Alone is subject to the mandatory restitution

18   provisions of the Amy, Vicky, and Andy Child Pornography

19   Victim Assistance Act of 2018 and the amendments of 18

20   United States Code Section 2259.  Those tell us that the

21   convictions which Mr. Chase Alone has for trafficking in

22   child pornography, I'm required to order mandatory

23   restitution in the amount that reflects Mr. Chase Alone's

24   relative role in appropriate victims' losses, but not less

25   than $3,000.

 1          So it's not a requirement that the United States

 2    create a factual basis.  The AVAA mandatory restitution is

 3    a statutory matter and as far as I can see in this case,

 4    not subject to challenge.

 5          Do you have a position on the Amy, Vicky, Andy

 6    Child Pornography Victim Assistance Act of 2018?

 7          MR. DEMIK:  No, Your Honor.  But I would just

 8    state for the record I understand the Court's reasoning.

 9          THE COURT:  Do you have any legal reason that

10    that act does not apply to this case?

11          MR. DEMIK:  No.

12          THE COURT:  All right.  Well, the restitution in

13    the amount of $3,000 for G.R.N. and $3,000 for N.H. is

14    mandatory under that act, and for good reason.  This is

15    part of what congress is trying to tell society and the

16    criminal justice system about what are minimal penalties,

17    financial in nature, identified by congress as mandatory.

18    So I'll have to give quite a recitation about that

19    restitution under the statute.

20          But as I said, restitution here and the special

21    assessments, those are the least of this case.  But they

22    are mandatory considerations that I have to impose.

23          Every federal judge at sentencing, Mr. Chase

24    Alone, is required to give a statement of reasons for why

25    we sentence the way we do in each case.  This is your

1   case; it's not anybody else's.  This is your life.  It's

2   G.R.N.'s life and N.H.'s life.  So the set of convictions

3   that are here for sentencing today -- you were present for

4   the trial.  Most of that experience was people talking

5   about your life, G.R.N. and N.H. and law enforcement

6   officers.  And a jury of twelve of your peers convicted

7   you and found beyond a reasonable doubt you're guilty of

8   all three counts that were brought against you.

9           In listening to you today, I didn't hear you

10  deny those things.  And you need not speak at all about

11  these convictions.  You did speak about your life and

12  what's changed and what your future is.  And as said, I do

13  respect that.

14          So I must do several things here in a statement

15  of reasons.  One, we know what the federal sentencing

16  guidelines are as I've calculated them.  The guideline

17  range is 900 months, which is 75 years in federal prison.

18  That's comprised of the maximum possible penalty of 30

19  years for count one, 30 years for count two, and 15 years

20  for the aggravated incest, count three.

21          Alongside that -- and of course Mr. Demik argued

22  it in his sentencing memorandum -- alongside of that is my

23  obligation to consider 18 United States Code Section

24  3553(a), the federal sentencing statute, to impose a

25  sufficient but not greater than necessary sentence.  I set

1    out those factors a little earlier in this hearing, and I

2    return to them now because I have to balance them in this

3    case, as I do in every case.

4              Here, in terms of the seriousness of the

5    offense, having presided over the trial and found credible

6    G.R.N., N.H., the law enforcement officers who testified

7    concerning these events, this is among the most serious of

8    sex offenses that we've had in this court for the last ten

9    years, the years that I've been here.  I started out the

10   first six years or so being a federal prosecutor.  Twenty

11   years of private practice working this Court on criminal

12   matters.  Federal public defender for North and South

13   Dakota from 2003 until I came to the bench in '09.

14             In other words, like many of the people involved

15   in this case, I spent most of my adult life dealing with

16   the very issues that you've brought to us here.

17             This is among the most serious forms of criminal

18   exploitation of two minors and of aggravated incest that I

19   have ever seen.  The assaults on G.R.N., the exhibits to

20   which I made mention, they're in the record.  These

21   beatings were horrific.  They were beyond what any human

22   being should experience.  The manipulation was consistent

23   and forceful.

24             There was violence involved to force G.R.N. to

25   be in a frame of mind to either conform and not resist, or

1    when she did resist, be beaten down to the extent that

2    there was no -- no normal human reaction to the events

3    that took place.  On top of which, of course, you're her

4    father, her biological father, in this case, which is

5    certainly an aggravated circumstance.

6            As to Noah, count two, this is a kid who was

7    going to -- you know, the Thursday night celebration in

8    Rapid City and ended up in your home, enticed into a

9    situation where he's having sexual intercourse with your

10   daughter while you're watching and filming it.  And when

11   you kicked him out of the house, you then had sexual

12   intercourse with G.R.N..

13           He's a real victim.  15 years old.  He's on

14   film.  It's been distributed.  We know that.  G.R.N. had

15   it on her Facebook Messenger.  So he's going to live with

16   that.  He's going to live with having to come into this

17   courtroom to talk about these events as a young person and

18   live with this.

19           And then of course at Manderson, the aggravated

20   incest, which resulted in the birth of G.R.N.'s son.

21   Well, no one can make more clear the pain and difficulty

22   that the incest and the birth of her son has had than what

23   she said here today.  He is not with her.  He's been

24   adopted out.  That's a scar on her life and his that --

25   for which there's no resolution.

1          So in terms of the seriousness of the offense,

2     these three counts are among the more serious that the

3     this Court has seen.

4          Your personal history and characteristics are

5     well identified in trial and in the sentencing hearing

6     again today.  You've expressed some changes in attitude in

7     finding sources of strength that did not appear to be part

8     of your life during the commission of these offenses.  But

9     it's a highly manipulative situation, as Ms. Poppen

10    outlined.

11         I hope going forward your personal history and

12    characteristics are the positives ones that you've

13    described today.  But in the past, your personal history

14    and characteristics, and the way you've chosen to live and

15    your abuse of women is of great and grave concern.

16         We've spoken a lot about the manner in which

17    these offenses were committed.  I take judicial notice of

18    the trial testimony and what's been said here today.  It's

19    extraordinarily gruesome behavior, with permanent,

20    long-lasting effects on G.R.N. and on the son she bore as

21    a result of your incest.  And as I've said, as to Noah,

22    having to go through this at the young age that he did.

23         Now the need to protect the community from

24    future crimes, the length of prison sentence required in

25    this case will protect the community from future criminal

1   behavior because you won't be in the community.  I'm going

2   to put you on lifetime supervised release in the event

3   that you are released from prison at some point, so that

4   the community can be protected and some rehabilitation

5   resources can be designed for you.

6          I do believe that the message that has to be

7   sent to the larger community can be sent by the length of

8   the prison sentence in this case.  It does show that there

9   are serious consequences for the more serious forms of

10  criminal behavior.

11         I have to avoid unfair sentences that are too

12  lenient or too severe.  And like Ms. Poppen, I went back

13  and looked at other cases.  There aren't very many of this

14  magnitude, even, to make a comparison.  But it is true

15  that the Chance Williams case, which brought a 720-month

16  custody sentence, did not have many of the aggravating

17  factors that are on the record during your trial and

18  during this sentencing hearing.  Your conduct is more

19  severe than the behaviors that were subject to sentencing

20  in his case.

21         Federal sentencing guidelines, of course, avoid

22  sentencing disparity because the 900-month sentence is

23  what anyone in the United States could expect to receive

24  in federal court for these crimes.

25         The needs for rehabilitation and treatment, I'm

1    going to recommend to the Bureau of Prisons that you be

2    placed in a federal correctional institution with specific

3    sex offender treatment available.  Dr. Ertz was clear

4    about that.  You also have some mental health needs that

5    must be addressed, and you have substance abuse treatment

6    needs to be addressed.  You have medical care issues.

7           I believe that the Bureau of Prisons will assess

8    you and put you in a proper facility to address all of

9    those needs and to keep you in the population with which

10   you're incarcerated safe.  So I will make that

11   recommendation.  The Bureau of Prisons can make its own

12   assessment of you, of course.

13          You're not being sentenced to prison here as

14   anything cruel or unusual.  Your conduct fully justifies

15   the sentence that I have to impose this your case,

16   Mr. Chase Alone.  And your speaking today, which was clear

17   and obviously the result of long-term reflection, I do not

18   disagree with your view that you should have what probably

19   constitutes a life sentence.  I think that's a fair and

20   just sentence.  It is not greater than necessary to

21   protect the community and satisfy the purposes of federal

22   sentencing.

23          I find no basis for a downward variance, so I'll

24   deny the defense motion for a downward variance in this

25   case.

1          I do find the federal sentencing guidelines,

2    consider the appropriate factors for counts one, two, and

3    three.  There's no basis that I can find in this record

4    for a downward departure under the guideline system.

5          So I will impose a guideline sentence, which is

6    the same sentence, Mr. Chase Alone, I'd reach as I balance

7    the discretionary sentencing factors under 3553(a).

8          So if you would please stand, Mr. Chase Alone, I

9    will announce this sentence.

10         Based on the constitutional and statutory

11   authority vested in the court, it is the judgment of the

12   Court that Henry Chase Alone is hereby committed to the

13   custody of the United States Bureau of Prisons on count

14   one to be incarcerated for a term of 30 years; on count

15   two, to be incarcerated for a term of 30 years,

16   consecutive to the sentence imposed in count one; and as

17   to count three, the maximum term permitted by congress is

18   15 years, and I do impose that as a sentence, consecutive

19   to the sentences imposed for counts one and two.

20         Those are consecutive sentences totaling

21   900 months of custody, Mr. Chase Alone, 75 years in

22   federal prison.

23         You do meet the criteria for the United States

24   Bureau of Prisons' participation in sex offender treatment

25   programs.  I'm going to recommend to the Bureau of Prisons

 1    this your judgment that you be designated to a federal

 2    facility which will allow participation in that type of

 3    program.

 4              If you are released from imprisonment, of

 5    course, which you have every right to life going forward.

 6    Upon release from imprisonment you are placed on

 7    supervised release on counts one, two, and three for a

 8    term of life, which is the maximum term of supervised

 9    release available.  But I think it's necessary to protect

10    the community and to address any rehabilitative needs when

11    you come out of custody.

12              Those life terms of supervised release run

13    concurrently; that is, at the same time.

14              The mandatory conditions of supervised release

15    are the following:

16              You cannot commit another federal, state, local,

17    or tribal offense on supervision.

18              You cannot illegally possess a controlled

19    substance.  You have to submit to one drug test within

20    15 days of your release from custody and at least two drug

21    tests there after as directed by probation.

22              You must cooperate in the collection of DNA,

23    which is required in every federal felony sentencing.

24              And you must comply with the requirements of the

25    Sex Offender Registration and Notification Act as required

1    by statute.

2              We have standard conditions of supervised

3    release adopted by this Court.

4              Did you have a concern about the standard

5    conditions, Mr. Demik?

6              MR. DEMIK:  Yes, Your Honor.  Standard condition

7    12 I'd like to object to, for the record.

8              THE COURT:  Do you want to make any argument

9    with regard to standard condition number 12 of

10   supervision?

11             MR. DEMIK:  No, Your Honor.  I just believe

12   it's --

13             THE COURT:  Is your mic on?

14             MR. DEMIK:  No, I'm sorry.

15             I take the position it's unconstitutionally

16   vague and an improper delegation of judicial power.  So

17   that's the grounds for the objection to standard condition

18   number 12.

19             THE COURT:  All right.  Do you have any legal

20   authority to support your position that that standard

21   condition is unconstitutional?

22             MR. DEMIK:  Not offhand, Your Honor.  I did make

23   this objection in another case, which was subject to plain

24   error review, which is pending in the Eighth Circuit.  But

25   in this case I would like to make the objection explicit,

1    to preserve it.

2           THE COURT:  Well, I'll note your objection, not

3    having any authority presented with regard to your

4    objection.  And this being a standard condition of

5    supervised release, I'll overrule your objection.  If the

6    United States Court of Appeals wishes to give district

7    courts guidance on that standard condition, that would be

8    welcomed.

9           So the standard conditions of supervised release

10   apply to you, Mr. Chase Alone, and must be followed as

11   part of your sentence.

12          The special conditions are very limited in

13   number because of the length of your custody sentence.

14          First, you must not initiate, establish, or

15   maintain contact with any female child under the age of 18

16   years of age nor attempt to do so except under

17   circumstances approved by and approved in advance by the

18   United States Probation office.

19          The second special condition is you must not

20   enter onto the premises, travel past, or loiter near where

21   the victims of these offenses reside.  You're to have no

22   correspondence, no direct or indirect contact of any kind

23   with G.R.N. or N.H..  not personally or through any third

24   party.

25          Third, you must not reside with any child under

1 the age of 18 or contact your own children in any manner

2 unless approved in advance and in writing by the United

3 States Probation office while you're on supervision.

4 Fourth, you must reside and participate in a

5 residential reentry center, as directed by the probation

6 office. That could be a halfway house. It could be

7 residential treatment. But I'm making that tool available

8 to probation if you're on supervision.

9 Fifth, you must participate in sex offender

10 treatment and submit to polygraph examinations as directed

11 by the probation office.

12 In terms of restitution and monetary penalties,

13 I order you to make restitution to G.R.N. and to Noah each

14 in the amount of $3,000. And that is imposed under AVAA,

15 and we discussed earlier. That's the minimum restitution

16 amount I can impose, and I do impose it based on the

17 record in this case.

18 Any payment made that is not payment in full

19 shall be divided proportionately between G.R.N. and N.H..

20 you must notify the United States Attorney's Office within

21 30 days of any change of residence or mailing address,

22 Mr. Chase Alone. Because the financial litigation unit of

23 the U.S. Attorney's Office will be tracking to make

24 certain that you are making the required restitution

25 payments.

1          Payment of the total restitution and other

2    criminal monetary penalties shall be due in regular

3    quarterly installments of 50 percent of the deposits in

4    your inmate trust account while you're in the custody of

5    the United States Bureau of Prisons, and ten percent of

6    your inmate trust account while you're serving custody in

7    a residential reentry center or halfway house.

8          Any portion of the monetary obligations not paid

9    in full prior to your release from custody shall be due in

10   monthly installments of $50, with those payments to begin

11   60 days after you're released from custody.

12         I do find, sir, that based on the presentence

13   report you are an indigent person, so I'm going to waive a

14   fine in your case.  I will also waive the interest

15   requirement on the restitution amounts.  We need to get

16   those restitution amounts paid.

17         I further order that you must pay to the United

18   States on counts one, two, and three each, a special

19   assessment of $100, for a total of $300 in special

20   assessments.  That amount is due immediately, or it

21   becomes part of your monetary judgment you pay over time.

22         The $5,000 special assessment under the Justice

23   for Victims of Trafficking Act of 2015 is waived.  You are

24   indigent within the meaning of that statute, as

25   demonstrated by the presentence report.  So there will be

1      no special assessment under that law.

2              You may be seated, Mr. Chase Alone.

3              Ms. Poppen, is there any legal reason why the

4      sentence should not be imposed as announced?

5              MS. POPPEN:  No, Your Honor.

6              THE COURT:  Your objections are preserved for

7      the record, Mr. Demik.  I will not ask you to agree with

8      this sentence.

9              Any need for clarification, Ms. Becker?

10             PROBATION OFFICER:  No, Your Honor.

11             THE COURT:  Mr. Chase Alone, I do impose the

12     sentence as I have announced it.

13             Now, you have 14 days from today's date to

14     challenge this sentence in the United States Court of

15     Appeals for the Eighth Circuit.  If you wish to appeal,

16     tell Mr. Demik, and he'll file the papers to protect your

17     rights on appeal.

18             Do you understand you have only 14 days within

19     which to appeal?

20             THE DEFENDANT:  Yes, Your Honor.

21             THE COURT:  Is there anything further,

22     Ms. Poppen?

23             MS. POPPEN:  No, Your Honor.  Thank you.

24             THE COURT:  Mr. Demik?

25             MR. DEMIK:  No, Your Honor.

1          THE COURT:  Court is adjourned.

2          MR. DEWELL:  All rise.

3          (End of proceedings this date at 12:56 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    COURT REPORTER'S CERTIFICATE

3

4    UNITED STATES DISTRICT COURT  )
     DISTRICT OF SOUTH DAKOTA       )       SS
     WESTERN DIVISION               )

5

6              I, Sheri L. Not Help Him, RPR, CRR, Official

7    Court Reporter in and for the United States District

8    Court, District of South Dakota,

9              DO HEREBY CERTIFY that I acted as such Court

10   Reporter at the SENTENCING HEARING of the within-entitled

11   action, and that the foregoing restricted transcript,

12   pages 1 to 92, inclusive, is a true and complete

13   transcript of my stenographic notes taken at said

14   SENTENCING HEARING on December 16, 2019.

15             Dated at Rapid City, South Dakota, this 13th day

16   of January, 2020.

17                   /s/ Sheri L. Not Help Him
                     _____
18                   SHERI L. NOT HELP HIM
                     Official Court Reporter
19                   515 Ninth Street #302
                     Rapid City, SD  57701
20                   Phone:  (605) 399-6007
                     Email: Sheri_nothelphim@sdd.uscourts.gov
21

22

23

24

25